******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FAIRWINDCT, INC., ET AL. *v*. CONNECTICUT
SITING COUNCIL ET AL.
(SC 19090)
(SC 19091)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa and Robinson, Js.

*Argued February 21—officially released September 23, 2014*

*Emily A. Gianquinto*, with whom were *Nicholas J. Harding* and *Mary E. Mintel*, for the appellants (plaintiffs).

*Clare E. Kindall*, assistant attorney general, with whom were *Robert L. Marconi*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, for the appellee (named defendant).

*Michael A. Kurs*, with whom were *Lee D. Hoffman* and *Paul Corey*, for the appellee (defendant BNE Energy, Inc.).

*Opinion*

ROBINSON, J. This appeal arises from two petitions for declaratory rulings that the defendant BNE Energy, Inc. (BNE), submitted to the named defendant, the Connecticut Siting Council (council). In the petitions, BNE sought the council's approval for the construction and operation of three electric generating wind turbines at two separate sites in the town of Colebrook. The plaintiffs, FairwindCT, Inc. (FairwindCT), Stella Somers, Michael Somers and Susan Wagner, were granted party status by the council and also intervened in the proceedings on the petitions pursuant to General Statutes (Supp. 2014) § 22a-19.[1] The council approved both petitions with conditions. The plaintiffs appealed from each of the council's rulings pursuant to General Statutes § 4-183, and the trial court dismissed the appeals. These appeals followed.[2] The plaintiffs claim on appeal that the trial court incorrectly determined that: (1) the council had jurisdiction over BNE's petitions pursuant to General Statutes (Supp. 2014) § 16-50k (a);[3] (2) the council was authorized to attach conditions to its approval of the petitions; (3) the council was authorized to approve the petitions if the proposed projects did not comply with state noise law; (4) the council's approval of eighty meter hub heights for one of the projects was supported by substantial evidence; and (5) the council did not deprive the plaintiffs of their right to fundamental fairness during the hearings on the petitions. We affirm the judgments of the trial court.

The record reveals the following procedural history and facts that were found by the trial court or that are undisputed. On December 6, 2010, pursuant to § 16-50k (a)[4] and General Statutes § 4-176 (a),[5] BNE submitted a petition to the council seeking a declaratory ruling that it could construct and operate three 1.6 megawatt wind turbines at 29 Flagg Hill Road and 17 Flagg Hill Road in Colebrook (Colebrook South project), without first obtaining a certificate of environmental compatibility and public need (certificate). On December 13, 2010, BNE submitted a similar petition for the construction and operation of three 1.6 megawatt wind turbines on property located at the intersection of Route 44 and Rock Hall Road in Colebrook (Colebrook North project). In both petitions, BNE claimed that it was not required to obtain certificates because the projects were "grid-side distributed resources . . . facilit[ies]" for purposes of General Statutes (Supp. 2014) § 16-50k (a).

FairwindCT was formed by several Colebrook residents for the purpose of educating the public about the regulation and operation of industrial wind generation projects in Connecticut. Stella Somers and Wagner are officers and directors of FairwindCT. Stella Somers and her husband, Michael Somers, own a resort hotel known as Rock Hall, which is located approximately one-half

mile from the Colebrook North project and one and one-half miles from the Colebrook South project. Wagner owns residential property that abuts the Colebrook North project and is within one mile of the Colebrook South project. The council granted the plaintiffs' requests for party status in the proceedings on BNE's petitions pursuant to General Statutes §§ 4-177a[6] (a) and 16-50n (a),[7] and the plaintiffs also intervened in the proceedings pursuant to § 22a-19 (a) (1),[8] which is part of the Connecticut Environmental Protection Act (CEPA).

The council held public hearings on the Colebrook South project during March and April, 2011, and on the Colebrook North project during April and May, 2011. The plaintiffs participated in the hearings and submitted testimony and documentary evidence in support of their position that BNE had failed to establish that the proposed projects would comply with state noise law and governing water quality standards or that the projects would not have an adverse environmental impact. The council ultimately granted both of BNE's petitions, with conditions.[9] The plaintiffs appealed from the council's rulings to the trial court pursuant to § 4-183 (a). After conducting an evidentiary hearing, the trial court dismissed the appeals, and these appeals followed.[10]

We address each of the plaintiffs' claims on appeal in turn. Additional facts and procedural history will be set forth as necessary.

I

The plaintiffs first claim that the trial court incorrectly determined that the council had jurisdiction over BNE's petitions because the projects are neither "grid-side distributed resources project[s]" nor "facilit[ies]" for purposes of General Statutes (Supp. 2014) § 16-50k (a).[11] See General Statutes (Supp. 2014) § 16-50k (a) (council can approve by declaratory ruling any "grid-side distributed resources project or facility"). We conclude that the trial court properly concluded that the council had jurisdiction over BNE's petitions because the projects were "facilit[ies]" for the purpose of § 16-50k (a).

The following additional procedural history is relevant to our resolution of this claim. The council determined that it had jurisdiction over the petitions pursuant to § 16-50k (a) because they were grid-side distributed resource projects with a capacity of not more than sixty-five megawatts and used "wind renewable energy sources." On appeal to the trial court, the plaintiffs contended that the Colebrook North and Colebrook South projects were not "facilit[ies]" for purposes of § 16-50k (a) because " '[f]acility' " is defined by General Statutes § 16-50i (a) (3) to include "any electric generating or storage facility using any fuel," and wind is not a fuel.[12] The trial court concluded that

wind is a fuel and rejected this claim. In support of this conclusion, the trial court relied on General Statutes (Rev. to 2009) § 16-1 (a) (22), which defines " '[r]enewable fuel resources' " as "energy sources described in [subdivision] (26) . . . of this subsection," which, in turn, defines " '[c]lass I renewable energy source' " to include "wind power . . . ." General Statutes (Rev. to 2009) § 16-1 (a) (26) (A). The trial court also observed that General Statutes (Rev. to 2009) § 16a-17 (1), which is located in chapter 296 of title 16a and governs the operation of fuel supply businesses, defines " '[f]uel' " to include "any . . . resource yielding energy . . . ." The plaintiffs challenge this conclusion on appeal to this court.

We begin our analysis with the standard of review. "Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Internal quotation marks omitted.) *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, 283 Conn. 672, 691, 931 A.2d 159 (2007). It is also well established "that courts should accord deference to an agency's formally articulated interpretation of a statute when that interpretation is both time-tested and reasonable." *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 166, 931 A.2d 890 (2007).

This court also has held, however, that "when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . *Wallingford* v. *Dept. of Public Health*, 262 Conn. 758, 771–72, 817 A.2d 644 (2003); see *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 109, 653 A.2d 782 (1995) (the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . [but] it is for the courts, and not for administrative agencies, to expound and apply governing principles of law . . .)." (Internal quotation marks omitted.) *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 691. Because the council's interpretation of the phrase "grid-side distributed resources project or facility" as used in § 16-50k (a) is not time-tested and has not previously been subject to judicial review, we conclude that our review is plenary.[13]

In determining the scope of the council's authority under § 16-50k (a), "we are guided by fundamental principles of statutory construction." *In re Matthew F.*, 297 Conn. 673, 688, 4 A.3d 248 (2010); see General Statutes

§ 1-2z.[14] "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Testa* v. *Geressy*, 286 Conn. 291, 308, 943 A.2d 1075 (2008).

The plaintiffs claim that the legislature intended to exclude from the scope of § 16-50i (a) (3) any electric generating facility that does not use fuel. General Statutes § 16-50i (a) (3) (defining " '[f]acility' " to include "any electric generating or storage facility using any fuel, including nuclear materials"). Section 16-50i (a) (3) (iii) expressly excludes from the definition of " '[f]acility,' " however, certain types of electric generating facilities that, "in the case of a facility utilizing renewable energy sources, [have] a generating capacity of one megawatt of electricity or less . . . ." As we have indicated, renewable energy sources are statutorily defined to include wind. See General Statutes (Rev. to 2009) § 16-1 (a) (26).[15] Thus, when the legislature amended § 16-50i (a) (3) in 1981 to exempt certain facilities that use renewable energy sources from the provisions of the Public Utility Environmental Standards Act (act); see Public Acts 1981, No. 81-439, § 4; it must have believed that electric generating facilities that use renewable energy sources, including wind, were encompassed by the definition of "facility."

Indeed, it is more rational to conclude that the legislature's intent was to *include* all electric generating plants in the definition of facility, regardless of how the plant is powered, than to conclude that the legislature's intent was to *exclude* electric generating plants that do not use fuel, as that term is ordinarily understood, because, when § 16-50i was first enacted in 1971; see Public Acts 1971, No. 575, § 3; it is doubtful that the legislature intended to restrict the definition of fuel to only include combustible material as is argued by the plaintiffs.[16] This conclusion is supported by General Statutes § 16-50g,[17] which sets forth the legislative finding and purpose of the act and provides that "[t]he legislature finds that *power generating plants* . . . have had a significant impact on the environment and ecology of the state of Connecticut" and that "continued . . . development of such power plants . . . if not properly planned and controlled, could adversely affect the quality of the environment . . . ." (Emphasis added.) Thus, the language of § 16-50g implies that the legislature intended for the council to have jurisdiction over *all* "power generating plants," an interpretation that is strongly supported by the legislative history of the act. Specifically, during hearings on the proposed legislation before the Joint Standing Committee on the Environment, Senator George L. Gunther explained that the legislation was "basically designed to create a commission to regulate the siting of power plants in our state." Conn. Joint Standing Committee Hearings, Environment, Pt. 2, 1971 Sess., p. 458. Senator Gunther also explained that the need to control the siting of power

plants and to regulate their effects on the environment was "brought . . . to a head" when the United Illuminating Company acquired Cockenoe Island with the intent of constructing a nuclear power plant there. Id. Thus, it is reasonable to conclude that the language in § 16-50i (a) (3) referring to "any fuel, including nuclear materials," was merely intended to make it emphatically clear that the council's jurisdiction over the siting of "electric generating facilities" would *include* jurisdiction over the siting of nuclear power plants. Moreover, although one person who testified before the Joint Standing Committee on the Environment expressed concern about the air pollution caused by fuel burning electric generating plants; see id., p. 500, remarks of Sylvia Dowling (referring to extensive air pollution that would be caused by proposed fuel oil burning electric generating plant in Stamford); nothing in the act or its legislative history suggests that the only problems that it was intended to address were those associated with the consumption of fuel. To the contrary, the act expressly provides that it was intended to address the effects of electric generating plants on the water resources of the state, on the "proliferation of towers in the state"[18] and on "scenic . . . values . . . ."[19] General Statutes § 16-50g. The construction of electric generating wind turbines implicates all of these concerns. In addition, § 16-50g refers to "the need for adequate and reliable public utility services at the lowest reasonable cost to consumers" and the necessity of balancing that need with environmental concerns. We can perceive no reason why, unlike other electric generating plants, the legislature would have intended to exempt wind turbine projects, which add to the supply of electricity in the state and "promote energy security," from the provisions of the act and subject them to ordinary zoning procedures.

This interpretation of § 16-50i (a) (3) is also supported by the legislature's enactment, in 2011, of General Statutes § 16-50kk, which directs the council, in consultation with the Department of Energy and Environmental Protection (department),[20] to "adopt regulations, in accordance with the provisions of chapter 54, concerning the siting of wind turbines." Public Acts 2011, No. 11-245, § 1. Section 16-50kk (b) provides that the council "shall not act on any application [for a certificate] or petition [for a declaratory ruling] for siting of a wind turbine until after the adoption of regulations pursuant to subsection (a) of this section." Because nothing in § 16-50kk confers jurisdiction on the council over applications for certificates, which necessarily relate to "facilit[ies]" under § 16-50k (a); see General Statutes (Supp. 2014) § 16-50k (a) ("no person shall . . . commence the construction . . . of a *facility* . . . without having first obtained a certificate of environmental compatibility and public need" [emphasis added]); it is reasonable to conclude that when the legislature

enacted § 16-50kk, it believed that the electric generating wind turbines were facilities for purposes of § 16-50i (a) (3).[21]

We conclude, therefore, that, as used in § 16-50i (a) (3), the word "facility" includes "any electric generating . . . facility," in the ordinary sense of that phrase, and the phrase "using any fuel, including nuclear materials," was merely intended to ensure that all electric generating facilities would be *included* in the scope of the act regardless of the type of fuel that a facility used. It was not intended to ensure that an electric generating facility would be *excluded* from the scope of the statutory scheme if it used no fuel.[22] Because there is no dispute that the proposed projects in the present case were electric generating facilities and they do not fall within any exception to § 16-50i (a) (3), we conclude that the council had jurisdiction to consider BNE's petitions.

II

We next address the plaintiffs' claim that the trial court incorrectly determined that the council was authorized to attach conditions to declaratory rulings issued pursuant to § 16-50k (a). The defendants contend that the plaintiffs lack standing to challenge the conditions. We conclude that the plaintiffs lacked standing to challenge the conditions, per se, but our analysis does not end here. We also conclude that the plaintiffs had standing to claim that the imposition of the conditions showed that the council had not determined that the proposed projects complied with the substantive requirements of the act when it approved BNE's petitions. We further conclude that: (1) the council actually ruled that the proposed projects complied with the act; and (2) its rulings were supported by substantial evidence. Accordingly, we reject this claim on its merits.

The following additional procedural history is relevant to our resolution of this claim. In its decisions approving the petitions for the Colebrook North and Colebrook South projects, the council imposed numerous conditions on the construction of the wind turbine projects. Most significantly, the council required BNE to submit a development and management plan that would include, among other things, "[a] detailed site plan showing the placement and/or extent of vegetative clearing, grading, wetland buffers, access roads, turbine foundations, building specifications, equipment and material laydown and staging areas"; "an open space and conservation plan to protect environmentally-sensitive areas of the property for the life of the project"; "[a]n erosion and sediment control plan, consistent with the 2002 Connecticut Guidelines for Soil Erosion and Sediment Control . . . as amended"; a "[s]tormwater [m]anagement [p]lan, consistent with the [department's] 2004 . . . Stormwater Quality Manual"; "[a] post-construction noise monitoring protocol describing

locations, frequency and methods to be employed for a post-construction noise study"; and implementation of the noise study to determine whether "any mitigation measure should be employed, including turbine operations management, to ensure the project complies with [the department's] noise regulations . . . ."

On appeal to the trial court, the plaintiffs contended that the council had no authority under § 16-50k (a) to impose these conditions on its approval of the declaratory rulings. They further argued that, even if the council had such authority, it exceeded that authority by imposing conditions that allowed BNE to meet the substantive standards for approval *after* the projects were approved. BNE contended that the plaintiffs lacked standing to contest the imposition of conditions on the approvals because they were not aggrieved by them. The trial court agreed with BNE that the plaintiffs lacked standing to challenge the imposition of conditions but, nevertheless, addressed the merits of the plaintiffs' claim and rejected it on the ground that the council impliedly had the same authority to impose conditions on the approval of declaratory rulings issued pursuant to § 16-50k (a) as it had to impose conditions on the approval of certificates.[23] See General Statutes (Supp. 2014) § 16-50k (a) ("[a]ny facility with respect to which a certificate is required shall thereafter be built, maintained and operated in conformity with such certificate and any terms, limitations or conditions contained therein"). The trial court also concluded that the record showed that the council had expressly found that the proposed projects met the substantive requirements for approval, and the council had not improperly allowed BNE to establish compliance with those requirements at some later date.

Because it implicates the trial court's subject matter jurisdiction, we first address the defendants' claim that the plaintiffs lack standing to challenge the council's imposition of conditions on its approval of BNE's petitions for a declaratory ruling. "[I]n order to have standing to bring an administrative appeal, a person must be aggrieved." (Internal quotation marks omitted.) *Moutinho* v. *Planning & Zoning Commission*, 278 Conn. 660, 664, 899 A.2d 26 (2006). "Classical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the decision, as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the agency's decision has specially and injuriously affected that specific personal or legal interest. . . . Aggrievement does not demand certainty, only the possibility of an adverse effect on a legally protected interest." (Internal quotation marks omitted.) Id., 665.

There is nothing in the record of this case that shows that the plaintiffs have specific, personal interests that

were affected by the conditions that the council imposed on its approvals of BNE's petitions. The conditions imposed no costs or burdens on them. Moreover, the plaintiffs lack standing as intervenors pursuant to General Statutes (Supp. 2014) § 22a-19 (a) (1) because the conditions themselves do not have "the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state." Accordingly, we agree with defendants that the plaintiffs lacked standing to challenge the council's imposition of the conditions, per se. We therefore conclude that the trial court lacked jurisdiction to entertain the plaintiffs' claim that the council had no statutory authority to impose the conditions.

The defendants do not dispute, however, that the plaintiffs' interests were affected by the council's *approvals* of BNE's petitions and, therefore, they have standing to challenge them. Accordingly, to the extent that the plaintiffs claim that the council's imposition of the conditions shows that the *approvals* were improper because the council had not determined that the petitions met the substantive requirements for approval when it issued its rulings or, if it had made such determinations, they were not supported by substantial evidence, we conclude that they have standing to raise those claims.

The standard of review for agency decisions is well established. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and [provides] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence . . . has said that it is something less than the weight of the evidence, and [that] the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 331–32, 732 A.2d 144 (1999). "[T]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." (Internal quotation marks omitted.) Id., 332. "As with any administrative

appeal, our role is not to reexamine the evidence presented to the council or to substitute our judgment for the agency's expertise, but, rather, to determine whether there was substantial evidence to support its conclusions." *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 86, 942 A.2d 345 (2008).

In support of their claim that the council's imposition of conditions on its approval of BNE's petitions shows that the council had made no determination that the petitions met the substantive requirements for approval, the plaintiffs in the present case rely on this court's decision in *Finley* v. *Inland Wetlands Commission*, 289 Conn. 12, 959 A.2d 569 (2008). In that case, the defendant Inland Wetlands Commission of the Town of Orange (commission) granted the application of the defendant Stew Leonard's Orange, LLC (Stew Leonard's), for a permit to conduct regulated activities. Id., 14–15. The commission imposed a number of conditions on the approval.[24] Id., 16. The plaintiffs, who had intervened in the proceedings pursuant to § 22a-19, appealed from the commission's decision claiming that it was not supported by substantial evidence. Id. The trial court denied the plaintiffs' appeal. Id. The plaintiffs then appealed to this court. Id., 16–17. This court concluded that it was "implicit in the condition of approval requiring Stew Leonard's to submit a '[r]evised and updated erosion control plan that implements all [s]tate [r]egulations' that the commission had not determined that the existing erosion control plan met state regulations when it rendered its decision." Id., 41. This court further concluded that the plaintiffs had "met their burden of proving that the commission's decision was not premised on a determination, supported by substantial evidence, that the proposed development complied with applicable statutes and regulations and would not cause harm to the wetlands." Id., 41–42. Accordingly, we reversed the judgment of the trial court and remanded the case to that court with direction to render judgment sustaining the plaintiffs' appeal. Id., 43.

The plaintiffs in the present case contend that, just as in *Finley*, the conditions of approval imposed by the council show that the counsel had not determined that the proposed projects were in compliance with water quality standards when it approved BNE's petitions. Specifically, the plaintiffs point to the following language that is contained in both of the council's rulings: "The [c]ouncil understands that designing the access road to the turbines on this site poses challenges regarding water quality . . . . However, the [c]ouncil believes these design challenges can be met, so that the project would not have an adverse impact on water quality.

"By ordering a [d]evelopment and [m]anagement . . . phase for the project, the [c]ouncil will assure that

the project would be designed to meet [the department's] water quality standards, in conformance with the 2004 Connecticut Stormwater Quality Manual, the 2000 [Department of Transportation] Drainage Manual and the 2002 Connecticut Guidelines for Soil Erosion and Sediment Control."

The council also expressly found, however, that, with respect to the Colebrook North project, "[t]he proposed project would comply with air and water quality standards" and, with respect to the Colebrook South project, that "[s]tormwater generated at the site would be controlled in accordance with the 2004 Connecticut Stormwater Quality Manual and the 2002 Connecticut Guidelines for Soil Erosion and Sediment Control." In addition, the council expressly found that, for both projects, "the effects associated with the construction, maintenance, and operation of a . . . wind renewable generating project . . . would meet all applicable [United States] Environmental Protection Agency and [department] . . . [w]ater [q]uality [s]tandards . . . ." This finding was supported in both cases by an extensive and detailed "stormwater management plan with stormwater pollution prevention plan" that BNE had submitted with the petitions.[25] There is nothing in the record to suggest that the plans that BNE submitted to the council with its petitions were different than the "erosion and sediment control plan, consistent with the 2002 Connecticut Guidelines for Soil Erosion and Sediment Control . . . as amended" and the "[s]tormwater [m]anagement [p]lan, consistent with the [department's] 2004 . . . Stormwater Quality Manual" that the council required BNE to include in the development and management plan as a condition of approval. Indeed, the council represents in its brief to this court that this condition was merely intended to require BNE to include in the development and management plan the erosion and sediment control plans and the stormwater management plans that it *already* had submitted to the council.

The plaintiffs contend, however, that, even if the council had made a final determination that BNE's petitions met the substantive requirements for approval, the documents that BNE submitted with the development and management plans after the hearings closed showed that that determination was not supported by substantial evidence. Although the trial court denied the plaintiffs' request to supplement the record with these materials and sustained the defendants' objection to the testimony of the plaintiffs' expert witnesses, William F. Carboni and Michael S. Klein, about the development and management plan, the plaintiffs made an offer of proof of the testimony that Carboni and Klein would have given in support of this claim. Specifically, the plaintiffs' attorney represented to the trial court that Carboni would have testified that information discovered during the development and management phase

confirmed his testimony during the hearings before the council that the original drainage plan for the Colebrook South project was inadequate. With respect to the Colebrook North project, Carboni would have testified that it had been discovered that portions of Rock Hill Road had to be rebuilt, which would have an adverse effect on nearby wetlands. In addition, Carboni would have testified that the development and management plan showed twice as much clearing as the original plan. Klein would have testified that, during the development and management phase, vernal pools had been discovered at the Colebrook South site that had required the redesign of the road. In addition, he would have testified that some of the slopes at the Colebrook South site were different than those shown on the original plans, so the road could not be built in accordance with those plans. With respect to the Colebrook North project, Klein would have testified that problems with erosion and stormwater caused by the rebuilding of Rock Hall Road were going to be compounded by the discovery that a culvert under the road had to be rebuilt. In addition, he would have testified that the increased clearing at the site meant increased runoff.

As the trial court recognized during trial, however, this offer of proof does not support the plaintiffs' claim that the council's approvals of BNE's petitions were not supported by substantial evidence in the record that was before the council when it made its decisions. Rather, it merely supports a conclusion that the plans that BNE had submitted to the council with its petitions had to be revised after approval to address unforeseen site conditions. Moreover, if a party can show that newly discovered conditions make it impossible for the project to comply with the substantive requirements for approval or that the revised plans are not in compliance with those requirements, the party is not without recourse. The party may bring this fact to the attention of the council and, if it is not satisfied with the result of such informal proceedings, it may file a petition for a declaratory ruling claiming that the project is not in compliance with the terms of approval,[26] bring a nuisance action[27] or bring a CEPA action.[28] See General Statutes § 22a-16.

We conclude, therefore, that the present case is distinguishable from *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 12. In *Finley*, the commission had approved Stew Leonard's regulated activities permit on the condition that it submit "a '[r]*evised and updated* erosion control plan that implements all [s]tate [r]egulations . . . .' " (Emphasis added.) Id., 41. It was clear, therefore, that "the commission had not determined that the existing erosion control plan met state regulations when it rendered its decision." Id. In the present case, the council expressly found that the existing plans for protecting water quality on each of the proposed projects satisfied water quality standards,

and merely required BNE to include those plans in the development and management plan to ensure ongoing compliance. Accordingly, we conclude that the trial court properly concluded that the council had not approved BNE's petitions without first determining that they complied with the substantive requirements for approval. Although the plaintiffs have presented evidence that the plans had to be revised after approval to address newly discovered site conditions, they have not established that the approvals were not supported by substantial evidence in the record before the council when it ruled on BNE's petitions. Accordingly, we reject this claim.

III

We next address the plaintiffs' claim that the trial court improperly determined that the council was not required to consider the requirements of state noise law when it approved BNE's petitions.[29] We disagree.

The following additional procedural history is relevant to our resolution of this claim. During the hearings before the council on BNE's petitions, the plaintiffs submitted the written "pre-filed" testimony of their expert, Michael Bahtiarian, regarding the proposed projects' compliance with Connecticut noise control regulations. Bahtiarian testified in both proceedings that, under § 22a-69-3.1 of the Regulations of Connecticut State Agencies, "[n]o person shall cause or allow the emission of excessive noise beyond the boundary of his/her Noise Zone so as to violate any provisions of these Regulations." Section 22a-69-1.1 (o) of the Regulations of Connecticut State Agencies defines "noise zone" to mean "an individual unit of land or a group of contiguous parcels under the same ownership as indicated by public land records and, as relates to noise emitters, includes contiguous publicly dedicated street and highway rights-of-way, railroad rights-of-way and waters of the state." Bahtiarian testified that the materials that BNE submitted with its petitions showed the BNE had not measured noise levels at the property line of the properties on which the projects were located, as required by these regulations, but at a more distant "receptor locations . . . ."[30] He further testified that, according to his calculations, "the wind turbines will not be in compliance with the Connecticut regulation at the property boundary." Specifically, he was of the opinion that, for the Colebrook South project, "these wind turbines will be in excess of [six] to [ten decibels] above the permitted limits at night," and, for the Colebrook North project, they would be "in excess of [six] to [nine decibels] above the permitted limits at night." In addition, he opined that, for the Colebrook South project, "excesses of [zero] to [four] decibels to the industrial-to-residential limit of [fifty-one] dB(A)[31] would also occur," and, for the Colebrook North project, "excesses of [zero] to [three] decibels" would

occur. The council ultimately concluded in each case that "noise emitted by the project would meet [the department's] allowable limits at the nearest residential receptors . . . ."

On appeal to the trial court, the plaintiffs contended that the council improperly ignored state noise law when it approved BNE's petitions. The trial court concluded that, although § 16-50k (a) required the council to consider only air and water quality standards when determining whether BNE's petitions should be approved, because the plaintiffs had intervened in the proceedings pursuant to § 22a-19, and because the council was authorized to give "such consideration to other state laws . . . as it shall deem appropriate" pursuant to General Statutes § 16-50x (a),[32] the council had jurisdiction to consider noise issues. Ultimately, the trial court observed that "the mission of the council is to balance public need and environmental impact"; see *Preston* v. *Connecticut Siting Council*, 20 Conn. App. 474, 489, 568 A.2d 799, cert. denied, 214 Conn. 803, 573 A.2d 316 (1990); and concluded that, in each case, "the council had the authority to find that a reasonable approach to noise pollution was to measure the harm at residences rather than property lines."

On appeal to this court, the plaintiffs renew their claim that the council was required to apply the department's noise regulations, which require noise levels to be measured at the property line, not at the receptor residential dwellings. The council does not dispute the plaintiffs' interpretation of the applicable noise regulations, and it also does not dispute the plaintiffs' claim that it made no finding that the proposed projects will comply with those regulations.[33] The council claims, however, that the trial court improperly determined that it had jurisdiction to consider noise issues when ruling on a petition for a declaratory ruling. Specifically, the council claims that, pursuant to § 16-50k (a), it is required to consider only whether the proposed projects meet the department's air and water quality standards. See General Statutes (Supp. 2014) § 16-50k (a) ("the council shall . . . approve by declaratory ruling . . . any . . . grid-side distributed resources . . . facility . . . as long as such project meets air and water quality standards of the Department of Energy and Environmental Protection"); see also *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 158, 788 A.2d 1158 (2002) (§ 22a-19 does not expand jurisdiction of agency beyond that conferred by statutes governing scope of specific agency's authority).

We first address the council's claim that the trial court incorrectly concluded that the council had jurisdiction to consider environmental issues other than compliance with air and water quality standards, including noise issues, when considering whether it should approve BNE's petitions.[34] Whether the council is

authorized or required to consider and apply state noise law when ruling on petitions for declaratory rulings is a question of statutory interpretation. Because the council's interpretation of the relevant statutes is not time-tested and has not previously been subject to judicial review, our review is plenary. *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control,* supra, 283 Conn. 691.

We conclude that the council has jurisdiction to consider state noise law when ruling on petitions for declaratory rulings. Section 16-50x (a) expressly provides in relevant part that "[i]n ruling on . . . petitions for a declaratory ruling for facilities . . . the council shall give such consideration to other state laws . . . as it shall deem appropriate."[35] In addition, the council has the expertise to determine whether a proposed project complies with state noise law, because: (1) state noise regulations are promulgated by the department; see General Statutes § 22a-69; and the commissioner of the department, or his designee, is a member of the council; see General Statutes (Supp. 2014) § 16-50j (b);[36] (2) when ruling on applications for certificates, the council is required to consider "[t]he nature of the probable environmental impact of the facility . . . including a specification of every significant adverse effect . . . and conflict with the policies of the state concerning . . . public health and safety" pursuant to General Statutes (Supp. 2014) § 16-50p (a) (3) (B);[37] and (3) pursuant to § 16-50kk, which was effective July 1, 2011, the council is now required to consider noise when ruling on petitions for declaratory rulings involving wind turbines.[38]

Having concluded that the council had jurisdiction to consider whether the proposed projects complied with state noise law, we next consider whether the council had authority to approve BNE's petitions if it determined that the projects did not comply with state noise law. We conclude that it did. As we have already noted, § 16-50x (a) provides that, "[i]n ruling on . . . petitions for a declaratory ruling for facilities . . . the council shall give such consideration to other state laws and municipal regulations as it shall deem appropriate." This language indicates that the council is not *required* to give *any* consideration to state noise law when ruling on a petition.

We also note that, when ruling on applications for certificates, the council is required to consider "the policies of the state concerning the natural environment . . . [and] public health and safety"; General Statutes (Supp. 2014) § 16-50p (a) (3) (B); but it is not required to deny applications that conflict with those policies. General Statutes (Supp. 2014) § 16-50p (a) (3) (C) (council must explain why fact that proposed project conflicts with state's public policies is "not sufficient reason to deny the application"). We can perceive no reason why

the legislature would have wanted to impose stricter standards on proposed projects that are eligible for approval by way of a declaratory ruling than on projects that require a certificate.

In support of their claim that the council must enforce state noise law when ruling on petitions, the plaintiffs rely on General Statutes § 22a-72 (c), which provides that "[e]ach . . . agency . . . (1) having jurisdiction over any property or facility . . . shall comply with federal and state requirements respecting control and abatement of environmental noise." The use of the word "comply" in this statute, however, as distinct from the word "enforce," suggests that the state agencies are merely required to comply with state noise law when operating their own properties or facilities, not that they are required to ensure that owners of private properties and facilities over which they have jurisdiction for some limited reason comply with state noise law. Indeed, many state agencies may not be competent to enforce state noise law.[39] Even if we were to accept the plaintiffs' interpretation of § 22a-72 (c), General Statutes § 16-50w provides in relevant part that "[i]n the event of any conflict between the provisions of this chapter and any provisions of the general statutes, as amended . . . this chapter shall take precedence." Accordingly, even if § 22a-72 (c) requires all state agencies to enforce state noise law on any property or facility over which they have jurisdiction, the provision of § 16-50x (a) authorizing the council to "give such consideration to other state laws and municipal regulations as it shall deem appropriate" would trump § 22a-72 (c).[40]

We conclude, therefore, that the legislature intended to authorize the council to approve petitions for declaratory rulings for proposed projects even if they do not comply with state laws outside of the act itself, including state noise law.[41] Accordingly, we agree with the trial court that the council was authorized to approve BNE's petitions even though it had not determined that the proposed projects comply with state noise law.

IV

We next consider the plaintiffs' claim that the council's approval of shorter hub heights for the Colebrook North project was not supported by substantial evidence and that, even if it was supported by substantial evidence, they were prevented from testing the reliability of that evidence because the evidence was not presented until the end of the last day of the hearings. We conclude that the approval was supported by substantial evidence and that, even if the council improperly allowed BNE to present evidence without providing the plaintiffs with an opportunity for rebuttal, any impropriety was harmless.

The following additional procedural history is relevant to our resolution of this issue. At the end of the

hearing on BNE's petition for a declaratory ruling approving the Colebrook North project, counsel for BNE asked the council how it wanted BNE to respond to concerns that a member of the council, Brian Golembiewski, had raised regarding the relocation of one of the turbines, and asked if BNE should submit a late filed exhibit. When the acting chairman of the council, Colin C. Tait, indicated that he did not think that such a submission would be appropriate because it would involve "redesigning the whole project," Paul Corey, a principal of BNE, asked if he could respond to Golembiewski 's concern, and Tait allowed him to do so. Corey stated that, with respect to concerns regarding the visual impact of the wind turbines, it would be possible to reduce the hub height of the wind turbines from 100 to 80 meters. Counsel for the plaintiffs then moved to strike Corey's statement, and Tait responded that the council would "take it for what it's worth." Tait explained that, "sometimes on cell towers when the only question is can it be moved X number of feet and the testimony indicates that it might be and does not involve wetlands and things that require further study, my thought is that at this point we will not require a late file. And if it turns out during discussions that it can be done but it doesn't redo the whole thing, we will consider it at the time and let [counsel for the plaintiffs] know about it . . . ."

In its decision approving the petition for a declaratory ruling for the Colebrook North project, the council ordered that, "[u]nless otherwise approved by the [c]ouncil, the wind turbines shall be constructed using 80 meter hub height and [an] 82.5 meter rotor diameter." The council explained that its "determination of minimal visual impact to the Rock Hall [p]roperty[42] is based on the 100 meter hubs and 82.5 meter rotor diameter and notes visibility will be improved by using 80 meter hubs at the proposed turbine locations." (Footnote added.)

At trial, Bahtiarian testified that if a wind turbine with an 80 meter hub and a wind turbine with a 100 meter hub have the same power output, they will produce the same level of noise. He also testified that "the shorter hub height makes the wind turbine closer to the property, and distance is the big factor in determining what sound is received at an abutter." In combination with the noise tolerance factor that had been discovered in certain documents that BNE had submitted under seal, lowering the hub heights would result in an approximately three decibel increase over previous noise level calculations at certain locations. Bahtiarian further testified that those noise levels would violate applicable noise regulations, under which noise is measured at the property line.

The trial court concluded that, because the plaintiffs had standing only to raise environmental concerns, they

could not raise a claim regarding the hub heights. Nevertheless, the court addressed the merits of their claim and concluded that they had failed to establish that lowering the hub heights would have any effect on noise levels. Specifically, the trial court relied on Bahtiarian's testimony at trial that lowering the hub heights would not affect the noise level produced by the wind turbines. Thereafter, the plaintiffs filed a motion for articulation in which they asked the trial court to clarify why it had determined that hub height was not an environmental issue. The plaintiffs also asked the trial court to clarify whether it had considered Bahtiarian's testimony that reducing the distance between the wind turbines and the noise receptor locations would increase noise levels at certain receptor locations. The court issued an articulation in which it stated that it had concluded that hub heights were not an environmental issue because they did not impact the natural resources of the state. The court also referred the plaintiffs to Bahtiarian's testimony that hub heights would have no affect on the noise produced by the wind turbines, and that the major factor affecting noise levels was distance from the turbines.

We first address the plaintiffs' claim that the trial court improperly determined that they lacked standing to challenge the council's order that the hub heights be lowered to eighty meters because the hub height of the wind turbines does not affect air or water quality or any other environmental factor at issue in this appeal. We agree with the plaintiffs. The plaintiffs raised a colorable claim that lowering the hub heights could affect the environment.[43] The trial court concluded that the council had jurisdiction to consider that claim, and we have agreed with that conclusion. See footnote 35 of this opinion. Accordingly, we conclude that the plaintiffs had standing to raise this claim.

We next address the plaintiffs' claim that the council's order that the hub heights on the Colebrook North project be lowered to eighty meters was not supported by substantial evidence. In support of their claim to the contrary, the defendants rely on testimony during the hearings before the council that an eighty meter wind turbine had been installed at a location known as Jiminy Peak. In addition, the defendants point to a product brochure for wind turbines that BNE had submitted with its petitions that referred to "80 and 100 meter tower configurations" and Corey's testimony that 80 meter hub heights would be feasible on the Colebrook North project. We agree with the defendants that this evidence supported the council's finding that the shorter hub heights would be feasible.[44] Moreover, we conclude that it was reasonable for the council to conclude that shorter hub heights would reduce visibility concerns.

We further conclude that, even if the council improp-

erly allowed BNE to raise the hub height issue at the last minute, thereby depriving the plaintiffs of an opportunity to evaluate and respond to the issue in a meaningful way, any such impropriety was harmless. As we have indicated previously in this opinion, the council was not required to consider state noise law when ruling on BNE's petition. A careful review of the record indicates that it is highly improbable that Bahtiarian's opinion that lowering the hub heights would increase noise levels at various locations on the property line by some undetermined amount, but less than three decibels, would have affected its decision.[45] The council's primary purpose in requiring BNE to lower the hub heights was to reduce the visibility of the towers from the Rock Hall property, and it is within the council's broad discretion to balance visibility concerns with noise concerns. In any event, even if it were likely that the council would have concluded that, in light of Bahtiarian's testimony, lowering the hub heights would result in intolerable noise levels, the remedy would be to order BNE to install wind turbines with 100 meter hub heights, not to deny the petition altogether.[46] Accordingly, the fact that the plaintiffs were unable to present Bahtiarian's testimony during the hearings before the council does not require reversal. See *Murach* v. *Planning & Zoning Commission*, 196 Conn. 192, 205, 491 A.2d 1058 (1985) ("not all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party must be shown" [internal quotation marks omitted]); see also *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 254, 9 A.3d 364 (2010) (burden is on party claiming error to prove that error was harmful); *Hicks* v. *State*, 287 Conn. 421, 439, 948 A.2d 982 (2008) ("[t]he harm[ful] error standard in a civil case is whether the improper ruling would likely affect the result" [internal quotation marks omitted]).

With respect to the plaintiffs' contention that "the change to shorter hub heights . . . could . . . have implications for other environmental concerns, including water quality, wildlife fatalities and protection of historic resources," they have pointed to no specific evidence or offer of proof that would support this claim.[47] Accordingly, any failure by the council to consider the environmental effects of lower hub heights must be deemed harmless. Cf. *In re Lukas K.*, 300 Conn. 463, 473–74, 14 A.3d 990 (2011) (denial of request for continuance in parental termination proceeding was harmless when parent had "not identified on appeal any additional evidence or arguments that he could have presented if the trial court had granted his request"); *State* v. *Lopez*, 280 Conn. 779, 790, 911 A.2d 1099 (2007) (when defendant did not identify on appeal any arguments that defense counsel would have made at sentencing hearing if trial court had granted defendant's request for continuance so that new counsel could review trial transcript, any impropriety in denying

request for continuance was deemed harmless). More-over, as with the other conditions that the council imposed on the approval of the project, if lowering the hub heights ultimately were to require substantive changes to the project plans, the plaintiffs could bring this fact to the attention of the council or file a petition for a declaratory ruling claiming that the project was not in compliance with the terms of approval. We conclude, therefore, that the trial court properly found that the council's order requiring BNE to lower hub heights on the Colebrook North project from 100 meters to 80 meters was supported by substantial evidence and that any impropriety in allowing the last minute introduction of the evidence was harmless.

V

We next address the plaintiffs' claim that the council deprived them of their right to "fundamental fairness." See *Grimes* v. *Conservation Commission*, 243 Conn. 266, 273, 703 A.2d 101 (1997) ("we have recognized a common-law right to fundamental fairness in adminis-trative hearings"). Specifically, the plaintiffs claim that the council improperly: (1) denied their request to cross-examine an employee of the department who had submitted comments on the proposed projects pursuant to § 16-50j (h); (2) denied their request to cross-examine witnesses about the cumulative impact of the projects; (3) allowed BNE to submit certain materials under seal and issued overbroad protective orders; and (4) denied their requests for continuances, thereby depriving them of adequate time to prepare for cross-examination of witnesses. We disagree.

"The right to fundamental fairness in administrative proceedings encompasses a variety of procedural pro-tections . . . . In a number of administrative law cases . . . we have characterized these procedural protec-tions as 'due process' rights. . . . Although the 'due process' characterization, at first blush, suggests a con-stitutional source, there is no discussion in these cases of a property interest in terms of constitutional due process rights. These decisions are, instead, based on a line of administrative law cases and reflect the devel-opment, in Connecticut, of a common-law right to due process in administrative hearings . . . [that] is not coextensive with constitutional due process." (Cita-tions omitted.) Id., 273 n.11. The scope of the right to fundamental fairness in administrative proceedings, like the scope of the constitutional right to due process that it resembles, is a question of law over which our review is plenary. *Megin* v. *Zoning Board of Appeals*, 106 Conn. App. 602, 608, 942 A.2d 511, cert. denied, 289 Conn. 901, 957 A.2d 871 (2008).

As a preliminary matter, we address the council's claim that the plaintiffs lack standing to raise these claims in the appeal from the council's ruling on the Colebrook South petition because, in that proceeding,

they do not have standing to appeal by virtue of their status as parties, but only by virtue of their status as intervenors pursuant to § 22a-19,[48] and, as such, they are not entitled to raise procedural claims. See *Pond View, LLC* v. *Planning & Zoning Commission*, 288 Conn. 143, 159, 953 A.2d 1 (2008) ("The intervenors have cited no case, and we have found none, in which this court has permitted environmental intervenors to raise purely procedural issues when the only basis for standing that they have alleged is § 22a-19. Although this court never expressly has concluded that standing under § 22a-19 does not include standing to raise any related procedural issues, it is axiomatic that the statute encompasses substantive environmental issues only, and the court repeatedly has declined to consider whether procedural issues are covered."). We disagree.

This court has repeatedly held that "all that is required to invoke the jurisdiction of the Superior Court under [CEPA] is a colorable claim, by any person [or entity] against any person [or entity], of conduct resulting in harm to one or more of the natural resources of this state. . . . Although it is true, of course, that the plaintiff need not prove its case at this stage of the proceedings . . . the plaintiff nevertheless must articulate a colorable claim of unreasonable pollution, impairment or destruction of the environment. . . . A complaint does not sufficiently allege standing [however] by merely reciting the provisions of § 22a-16, but must set forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from the challenged activities unless remedial measures are taken." (Citation omitted; internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *New London*, 282 Conn. 791, 804–805, 925 A.2d 292 (2007). This court also has held that "the mere allegation that a defendant has failed to comply with certain technical or procedural requirements of a statute imposing environmental standards does not, in and of itself, give rise to a colorable claim of unreasonable pollution under the [CEPA]. . . . A claim that the defendant has violated the substantive provisions of such a statute, however, may give rise to an inference that the conduct causes unreasonable pollution." (Citation omitted; emphasis omitted.) Id., 808.

*Fort Trumbull Conservancy, LLC*, involved an action brought pursuant to § 22a-16, and not an intervention in an administrative proceeding pursuant to § 22a-19. The same principles, however, apply here. See *Pond View, LLC* v. *Planning & Zoning Commission*, supra, 288 Conn. 159. Thus, "[t]he cases wherein we have permitted standing under § 22a-19 have involved circumstances in which the *conduct* at issue in the application before this court allegedly would cause direct harm to the environment." (Emphasis in original.) Id., 159–60.

In the present case, it is true that, as the defendants claim, the council's alleged conduct, namely, preventing the plaintiffs from cross-examining witnesses, issuing protective orders and not allowing the plaintiffs adequate time to prepare for cross-examination, could have had no direct impact on the environment. It is also true, however, that, if the plaintiffs can prove their procedural fairness claims, they will have established that they were deprived of a full and fair opportunity to participate in the hearings, resulting in an increased risk of an erroneous ruling by the council on the substantive issues before it, including the plaintiffs' claim pursuant to § 22a-19 that BNE's conduct would impair the natural resources of the state. In other words, the alleged deprivation of the plaintiffs' right to fundamental fairness could result in decisions by the council that did not give adequate consideration to environmental issues. It would be absurd to conclude that the plaintiffs had standing to intervene in the hearings before the council pursuant to § 22a-19 because they had made a colorable claim that the proposed projects would harm the environment, but they have no standing to claim that the council refused to provide them with a fair opportunity to present their claim. The right to a fundamentally fair hearing is implicit in the right to intervene pursuant to CEPA. We therefore reject the defendants' claim that the plaintiffs lack standing to raise these claims in the appeal from the council's ruling on the Colebrook South petition. Having reached this conclusion, we address the plaintiffs' procedural claims in turn.

A

We first address the plaintiffs' claim that the trial court incorrectly determined that the council did not deprive the plaintiffs of the right to fundamental fairness by denying their request to cross-examine an employee of the department of who had submitted comments on the proposed projects pursuant to § 16-50j (h).[49] We disagree.

The following additional procedural history is relevant to our resolution of this claim. On February 7, 2011, the council solicited comments on both projects from various agencies, including the department, pursuant to § 16-50j (h). The department submitted its comments, in the form of letters signed by Frederick L. Riese, a senior environmental analyst, on April 6, 2011. The next day, the plaintiffs submitted revised witness lists naming Riese as a witness. The council refused to allow the amendment and barred the plaintiffs from cross-examining Riese about the letters.[50]

In its rulings on the petitions, the council relied on Riese's letter to support several of its findings of fact.[51] In its conclusions of law, the council explained that it had not permitted Riese to testify because the plaintiffs

had not submitted any prefiled testimony for Riese, as the council had requested pursuant to its regulations. In addition, the plaintiffs had "failed to proffer what . . . Riese would testify about, failed to demonstrate how [their] case would be impaired without . . . Riese's testimony and failed to show how [they] would be prejudiced without the testimony." The council also observed that Riese was not a witness for the council or for any party or intervenor, but his comments were statutorily required.

On appeal to the trial court, the plaintiffs contended that they were prejudiced by their inability to cross-examine Riese about the letters that he had submitted to the council. At trial, when counsel for the plaintiffs attempted to question the plaintiffs' expert, Klein, about Riese's qualifications and the letters, counsel for the council objected on the ground that the plaintiffs had failed to present any testimony on that issue in the proceedings before the council. The trial court sustained the objection on the ground that Klein's opinion as to the propriety of Riese's submitting letters to the council that were not subject to cross-examination was irrelevant. Counsel for the plaintiffs then attempted to make an offer of proof regarding the testimony that Klein would have given. Specifically, she stated that Klein would testify that Riese lacked proper qualifications. At that point, the trial court interrupted counsel for the plaintiffs and asked why the plaintiffs could not have presented that evidence to the council. Counsel for the plaintiffs stated that the plaintiffs had not received the letters until after April 6, 2011, when the hearing on the Colebrook South petition had already begun, and that the council had imposed deadlines for the submission of prefiled testimony. The court then stated that, because Riese's qualifications and the unreliability of his opinions were irrelevant to the question of whether the council was authorized to receive his comments without affording the plaintiffs an opportunity to cross-examine him, it would not allow an offer of proof on those issues.[52]

In its memorandum of decision, the trial court, relying on General Statutes § 16-50o (a),[53] concluded that the council's refusal to call Riese as a witness was justified because "the plaintiffs, as intervenors, were not at the level of parties that were entitled to cross-examination in every instance."[54] It further concluded that "[t]he right to cross-examination in this instance was a matter of discretion for the council, as is the use that the council decides to make of the comments." Accordingly, it concluded that the council's refusal to call Riese as a witness had not deprived the plaintiffs of a fundamentally fair proceeding. The plaintiffs challenge this conclusion on appeal to this court.

We begin our analysis with a review of the governing statutes. General Statutes (Supp. 2014) § 16-50j (h) pro-

vides in relevant part that "[p]rior to commencing any hearing . . . the council shall consult with and solicit written comments from (1) the Department of Energy and Environmental Protection . . . . Copies of such comments shall be made available to all parties prior to the commencement of the hearing." Section 4-176 (g) provides that "[i]f the agency conducts a hearing in a proceeding for a declaratory ruling, the provisions of subsection (b) of section 4-177c, section 4-178 and section 4-179 shall apply to the hearing." General Statutes § 4-178 (3) provides that "when a hearing will be expedited and the interests of the parties will not be prejudiced substantially, any part of the evidence may be received in written form . . . ." Subsection (5) of § 4-178 provides in relevant part that "a party . . . may conduct cross-examinations required for a full and true disclosure of the facts . . . ." In addition, as we have indicated, § 16-50o (a) provides in relevant part that "[e]very party or group of parties as provided in section 16-50n shall have the right . . . to conduct such cross-examination as may be required for a full and true disclosure of the facts."

These statutes were intended to embody the common-law principles of fundamental fairness that this court recognized in *Grimes* v. *Conservation Commission*, supra, 243 Conn. 273, by ensuring that hearings on petitions for declaratory rulings are conducted in a manner that will not prejudice the parties and that will result in a full and true disclosure of the facts. Accordingly, the questions that we must address are whether the council reasonably could have concluded that calling Riese as a witness was not required to ensure a full and true disclosure of the facts and, if not, whether the plaintiffs were prejudiced by the council's refusal to allow the plaintiffs to cross-examine Riese.[55] See also *Roy* v. *Commissioner of Motor Vehicles*, 67 Conn. App. 394, 397, 786 A.2d 1279 (2001) ("[t]he plaintiff bears the burden of demonstrating that a hearing officer's evidentiary ruling is arbitrary, illegal or an abuse of discretion" [internal quotation marks omitted]).

We recognize that the council did not provide Riese's comments to the plaintiffs before the hearing on the Colebrook South petition commenced, as required by § 16-50j (h). We further recognize that, if the plaintiffs had had access to Riese's comments in a more timely manner, they would have been in a better position to explain to the council why they believed it was necessary to cross-examine him. On the basis of the entire record, however, we conclude that, even assuming that the council's failure to comply with the timing requirements of § 16-50j (h) was improper, that impropriety was harmless. We also conclude that the council was not required pursuant to § 4-178 (5) or § 16-50o (a) to allow the plaintiffs to cross-examine Riese.

First, the only items in the record before the council

that the plaintiffs have identified as being relevant to this claim are their amended witness lists naming Riese as a witness and the council's conclusions of law explaining their decision to disallow Riese's testimony. Although we recognize that the plaintiffs did not receive Riese's comments until after the hearing on the Colebrook South project had commenced, they have not explained why they could not have informed the council of the reasons that they were concerned about the reliability of Riese's opinions, that they believed it was necessary to call him as a witness and that they could not comply with the council's deadlines for identifying witnesses. The plaintiffs also have not explained why, during their examination of their own experts, they could not have asked them about Riese's letters.[56]

Second, although the council relied on Riese's comments to support certain findings of fact, those findings were peripheral to the council's rulings. See footnote 51 of this opinion. We therefore do not agree with the plaintiffs' characterization of the council's use of the comments as "heavy reliance" on them. Moreover, a careful review of Riese's comments reveals that they were generally neutral and descriptive. He did not take any position on whether the petitions should be approved. Indeed, if anything, the comments brought attention to the shortcomings of BNE's petitions. Accordingly, we conclude that the council reasonably could have determined, on the basis of the record before it, that cross-examination of Riese was not required to allow the plaintiffs to present a "full and true disclosure of the facts . . . ." General Statutes § 4-178 (5); accord General Statutes § 16-50o (a). For the same reasons, we conclude that, even if we assume that the council's failure to comply with the timing requirements of § 16-50j (h) was improper, any such impropriety was harmless. See *Klein* v. *Norwalk Hospital*, supra, 299 Conn. 254; *Hicks* v. *State*, supra, 287 Conn. 439. We therefore reject the plaintiffs' claim that the council's denial of their request to call Riese as a witness deprived them of their right to fundamental fairness.

B

We next address the plaintiffs' claim that the trial court incorrectly determined that the council had properly refused to allow the plaintiffs to cross-examine witnesses about the cumulative impact of the two proposed projects. We conclude that we need not determine whether the council's ruling was improper because, even if we assume that it was, the plaintiffs have not established that they were harmed.

The following additional procedural history is relevant to our resolution of this claim. The plaintiffs filed two motions with the council requesting that the proceedings on BNE's two petitions for declaratory rulings be consolidated. The council denied both motions. Thereafter, during the hearing on the Colebrook South

petition, the plaintiffs sought to question a witness about the Colebrook North project and counsel for BNE objected on the ground that that project was not the subject of the hearing. When counsel for the plaintiffs argued that the council was required to consider the cumulative impact of the two projects pursuant to § 16-50p (a) (3) (B),[57] counsel for BNE countered that the council "has more than sufficient information to compare the effects of the two projects and to consider them cumulatively while still maintaining two separate records." Council Chairman Robert Stein ruled that "this is about Colebrook South since this one came first. When we get to the next one, then we can talk about the cumulative impact." Later in the hearing, counsel for the plaintiffs questioned a witness about the distance of the two projects from his property and counsel for BNE moved to strike the witness' response on the same ground. Stein again noted that the hearing was related only to the Colebrook South project and the plaintiffs would have ample opportunity to address the Colebrook North project in the other proceeding. He also indicated, however, that he would consider the witness' response for what it was worth.

In the hearing on the Colebrook North petition, counsel for the plaintiffs attempted to question a witness about the Colebrook South project and counsel for BNE objected on the ground that there were two separate proceedings. Counsel for the plaintiffs responded that the council had ruled in the hearing on the Colebrook South petition that the plaintiffs could present evidence about the cumulative impact of the two projects in the hearing on the Colebrook North petition. Counsel for BNE then stated that the council had ruled only that the proper place to discuss the Colebrook North project was in the hearing on that project, not that it would allow evidence about the cumulative effects of the projects. The council's staff attorney stated that, under § 16-50p (a) (3) (B), the council could consider only cumulative effects of *existing* facilities, not proposed facilities. Stein then corrected his earlier ruling on that basis and sustained BNE's objection to testimony about the cumulative impact of the projects.

In its conclusions of law on the Colebrook North petition, the council stated that "§ 16-50p [(a) (3) (B)] requires the [c]ouncil to consider the environmental impact of a proposed facility alone and cumulatively with other *existing* facilities.[58] It is conceivable that the [c]ouncil could have approved one of the petitions and not the other, or that the [c]ouncil could have approved or denied both petitions. Therefore, the [c]ouncil developed complete evidentiary records specific to each proposed facility." (Emphasis in original; footnote altered.) This same conclusion is contained within in the council's ruling on the Colebrook South petition. In its conclusions of law on the Colebrook North petition, the council also noted that its members were authorized

by the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., "to use their experience, technical competence and specialized knowledge in the evaluation of evidence and the determination of factual issues. This includes knowledge of agency records, such as [the Colebrook South petition], that are submitted to the [c]ouncil. In accordance with the UAPA and in consideration of two complete evidentiary records on two separate proposed facilities, the [c]ouncil used their experience, technical competence and specialized knowledge in the evaluation of evidence and the determination of factual issues concerning the cumulative environmental impacts of [the two projects]." (Footnotes omitted.) Finally, in its ruling on the Colebrook North petition, the council stated that it had "reviewed possible cumulative impacts from both wind turbine projects . . . at certain properties. No evidence in the record shows that any building is within a [one-half mile] of both a turbine in the Colebrook South project and a turbine in the Colebrook North project. We find no cumulative impacts in terms of noise, ice drop/throw or shadow flicker, and we find that cumulative impacts in terms of visibility are not substantial."[59]

In their briefs to the trial court, the plaintiffs contended that the council had deprived them of their due process rights by prohibiting them from presenting evidence on the cumulative impact of the two projects. They did not explain, however, in what manner the two projects would have an adverse cumulative effect.[60] In its memorandum of decision on the appeal from the council's ruling on the Colebrook North petition, the trial court stated that, in their capacity as parties to the proceeding, the plaintiffs lacked standing to raise the issue of cumulative impact pursuant to § 16-50k (a) because, under that statute, the council was limited to considering air and water quality, thereby implicitly finding that the plaintiffs' cumulative impact claim did not implicate those issues.[61] The court also concluded, however, that, in their capacity as intervenors pursuant to § 22a-19, the plaintiffs had standing to raise environmental issues, which included noise, but not visibility or shadow flicker. The court then noted that, in the proceedings before the council, BNE's expert had taken into account the noise produced by all six turbines and, at trial, the plaintiffs' expert testified that the cumulative effect of the projects on noise would be " 'nil.' " Accordingly, the court upheld the council's ruling that the projects would have no cumulative effect with respect to noise.[62] The plaintiffs challenge this conclusion on appeal to this court.

We conclude that we need not decide whether the council properly refused to admit evidence regarding the cumulative impact of the proposed projects because the plaintiffs have not identified any evidence that they would have presented to the council, had the opportu-

nity been afforded, that could have affected the council's determination that the proposed projects would have no cumulative impact. Thus, even if the council's refusal to admit the evidence was improper, the plaintiffs have not established that they were harmed by it. See *Klein* v. *Norwalk Hospital*, supra, 299 Conn. 254; *Hicks* v. *State*, supra, 287 Conn. 439; see also *In re Lukas K.*, supra, 300 Conn. 473–74; *State* v. *Lopez*, supra, 280 Conn. 790. Accordingly, we reject this claim.

C

We next address the plaintiffs claim that the trial court incorrectly determined that the council properly allowed BNE to submit certain materials under seal and that the council's protective orders were not overbroad. We conclude that we need not determine whether the council acted properly because, even if we assume that it did not, the plaintiffs have not met their burden of proving harm.

The following additional procedural history is relevant to our resolution of this claim. During the hearings on BNE's petitions, BNE asked the council for permission to file certain "confidential and proprietary business data" under seal and also asked the court to issue protective orders for the data. The plaintiffs objected to the motions to the extent that they related to "data regarding wind resources, wind speeds, and wind generation," information regarding setback recommendations and information regarding the "mechanical loads assessment" of the proposed turbines and certain noise emission characteristics. The plaintiffs contended that the materials were "public records" for purposes of General Statutes (Supp. 2014) § 1-210[63] and that they did not fall within the exception for trade secrets set forth in § 1-210 (b) (5) (A).[64] The council granted the motions to file under seal and issued protective orders providing that access to the protected materials would be provided only at the council's office and that "[n]o photocopying, no tape recording, no photographs, and no note-taking of any kind whatsoever of the protected materials will be permitted." The council further ordered that the protected materials would be made available to parties and intervenors provided that they executed a nondisclosure agreement and agreed to be bound by the protective orders. The plaintiffs again objected to the orders and asked for certain modifications, which the council denied.

The council explained its decision to issue the protective orders in its rulings on the petitions. The council observed that, pursuant to § 16-50o (c), "[t]he applicant shall submit into the record the full text of the terms of any agreement . . . entered into by the applicant and any party to the certification proceeding . . . in connection with the construction or operation of the facility. This provision shall not require the public disclosure of proprietary information or trade secrets."

The council noted that, under its procedures, proprietary information includes trade secrets and concluded that the protected materials constituted trade secrets as defined by this court in *Town & Country House & Homes Service, Inc.* v. *Evans*, 150 Conn. 314, 318–19, 189 A.2d 390 (1963).[65] The council also explained that "parties and intervenors in this proceeding, including, but not limited to expert witnesses, were afforded the opportunity to review the materials submitted under the protective order[s] upon signing a [n]on-[d]isclosure [a]greement. Furthermore, parties and intervenors were afforded the opportunity to submit interrogatory questions related to the confidential and proprietary information and responses to those interrogatories would have been provided by BNE under seal. The parties may also have availed themselves of the statutory process under the [Freedom of Information Act] for a determination from the Freedom of Information Commission that the parties were denied access to public records."[66] (Footnotes omitted.)

On appeal to the trial court, the plaintiffs again claimed that the protective orders had been overbroad and unduly restrictive.[67] At trial, Bahtiarian testified that he had learned about the existence of the protected materials when an attorney asked him during a hearing before the council if he knew about certain information contained in one of the sealed documents relating to noise data. He never looked at the sealed documents before the council issued its decision because he believed that doing so would not have been "fruitful" if he could not take notes or copy the documents.[68] Bahtiarian also testified that he had learned since the hearings that one of the sealed documents showed that the noise level of the wind turbines had a tolerance or uncertainty factor of two decibels, meaning that the worst case noise assessment that BNE had submitted with its petitions was low by two decibels.[69] Bahtiarian admitted that, if he had reviewed the sealed materials, he would not have had to take notes in order to remember the two decibel uncertainty factor. He also testified that, whenever noise is measured, there will be an uncertainty factor.

Carboni testified at trial that it was his understanding that he could not review the protected materials during the hearings on BNE's petitions. Instead, Carboni looked at equipment specifications that were publicly available online, and determined that the roads shown on BNE's plans probably were not wide enough to accommodate the equipment. During trial, he reviewed notes on the protected materials that counsel for the plaintiffs had taken. Those notes confirmed Carboni's opinion that the roads probably were not wide enough for the equipment. When he was asked whether the specifications in the sealed materials were "[d]ramatically or slightly" different than the specifications that were available online, Carboni testified that they were

"in the same general range."

Klein testified at trial that it was also his understanding that he could not review the protected materials during the hearings on BNE's petitions. After the council issued its rulings, however, he reviewed notes taken by counsel for the plaintiffs regarding the sealed materials. Klein testified that the equipment specified in the notes "would have the potential to affect the design of the onsite improvements and offsite infrastructure improvements that would be necessary to get that equipment onto the site and to safely move it around the site. Those improvements have a reasonable likelihood of having an environmental impact with respect to wetlands and water quality." Klein also admitted, however, that he did not know whether the roads would have to be widened, which was within Carboni's area of expertise, and that, if they did, he believed that BNE would be required to obtain certain construction permits to ensure that the construction met applicable water quality standards.

The trial court concluded that the council had properly entered the sealing orders and that, even if those orders or the terms of the protective orders had been improper, the plaintiffs had not established that they were harmed because the materials had been available for review by the plaintiffs' experts, and none of the experts had testified at trial that the sealed documents would have affected their opinions.

On appeal to this court, the plaintiffs claim that the council improperly sealed the protected materials because they were filed with a public agency and, pursuant to § 1-210, there is a presumption that documents filed with a public agency are public records, and the materials do not contain trade secrets for purposes of § 1-210 (b) (5) (A). They further contend that their lack of access to the sealed documents prejudiced them because the sealed documents: (1) revealed that there was a two decibel tolerance factor for the wind turbines that the council had not considered when it found that the projects would not exceed levels allowed by state noise law at the residential receptor locations; and (2) contained information suggesting that the area of site clearance required to ensure that large trucks and cranes would have access to the sites may have been larger than the areas shown in the plans that BNE submitted with its petitions, which in turn, could have had an effect on water quality.[70]

We conclude that we need not decide whether the council properly allowed BNE to submit the documents under seal and issued protective orders because, even if the council's actions were improper, the plaintiffs were not harmed. First, although the plaintiffs have suggested that timing issues and their inability to copy or take notes on the protected materials made it pointless to ask their experts to review the materials during

the hearings before the council, the information that they rely on in support of their claim that they were prejudiced was not so complex or technical that the experts could not have gathered the required information by simply reviewing the documents. The plaintiffs cannot make a tactical decision not to review the documents on the assumption that doing so would be fruitless and then, when it becomes apparent that doing so would not have been fruitless, claim that they were harmed by the council's orders rather than their tactical choice.

In any event, even if the council improperly allowed BNE to submit the protected materials under seal and the overbroad terms of the protective orders prevented the plaintiffs from discovering this information in a timely manner, any impropriety was harmless because the plaintiffs have not established that the council would likely have made different decisions if the plaintiffs had been able to examine or cross-examine witnesses about the information. See *Klein* v. *Norwalk Hospital*, supra, 299 Conn. 254; *Hicks* v. *State*, supra, 287 Conn. 439. With respect to the noise issue, the plaintiffs have pointed to no evidence or offer of proof in the record regarding the effect of the two decibel tolerance factor on noise levels at the residential receptors, which were the noise levels that the council considered when ruling on the petitions. With respect to the road width issue, Carboni testified that the technical equipment specifications in the protected materials were "in the same general range" as the publicly available specifications that he relied on to support his testimony before the council. Thus, the sealed information would have been merely cumulative of information that he already had.

The plaintiffs also contend, however, that, "without the assistance of their experts to more fully examine the contents of some of the more technical information, including the [mechanical load assessments] and the wind data, [they] simply do not know the total extent of the prejudice they suffered by not being permitted to properly analyze and cross-examine witnesses regarding these documents." Even if we assume that the plaintiffs' experts did not have sufficient access to the protected materials to testify about them intelligently or to assist the plaintiffs to prepare for cross-examination of BNE's witnesses in the hearings before the council, however, the plaintiffs have not explained why their expert witnesses could not have examined the documents during those hearings to determine whether they had been prejudiced by not having greater and more timely access to them. Accordingly, we reject this claim.

D

Finally, we address the plaintiffs' claim that the trial court incorrectly determined that the council did not

deprive them of their right to fundamental fairness by denying their requests for continuances. We conclude that we need not determine whether the council properly denied the requests for continuances because, even if we assume that the denials were improper, the plaintiffs have not met their burden of proving harm.

The following additional procedural history is relevant to our resolution of this claim. Before and during the hearings before the council, BNE, on several occasions, asked for extensions of time to respond to interrogatory responses and to file prefiled testimony and new evidence, which the council granted. On several occasions, the plaintiffs did not receive the newly filed materials, some of which were voluminous, until shortly before the hearing was to be conducted. In response to these late filings, the plaintiffs made several written and oral requests for continuances so that they would have adequate time to review the materials and prepare for cross-examination of BNE's witnesses. The council denied all of the plaintiffs' requests for continuances.

In its rulings on the petitions, the council concluded that its procedures had been consistent with due process requirements. In support of this conclusion, it observed that "constitutional principles permit an administrative agency to organize its hearing schedule so as to balance its interest in reasonable, orderly and nonrepetitive proceedings against the erroneous deprivation of a private interest and it is not unconstitutional for the [c]ouncil, in good faith, to balance its statutory time constraints against [the plaintiffs'] desire for more time to present their objections to a proposal." See *Concerned Citizens of Sterling, Inc.* v. *Connecticut Siting Council*, 215 Conn. 474, 485–86, 576 A.2d 510 (1990). The council also stated that it had allowed the plaintiffs to submit additional information after the hearings had closed.

The trial court concluded in its memoranda of decision that "[t]he plaintiffs fail to demonstrate an unconstitutional abuse of discretion by the council in regards to its denial of the plaintiffs' continuance requests. The plaintiffs had ample opportunity prior to and during the hearings to obtain and present evidence to the council. . . . The council stated in its conclusions of law that the plaintiffs received ample time for cross-examination. . . . The court finds such denial of continuance requests properly within the discretion of the council." (Citations omitted.)

On appeal to this court, the plaintiffs renew their claim that the council's denial of their requests for continuances deprived them of their right to fundamental fairness. We need not decide whether the council abused its discretion in denying the requests for continuance, however, because the plaintiffs have identified no evidence that they would have produced, arguments that they would have made or questions that they would

have posed to BNE's witnesses if the council had granted their requests that likely would have affected the council's decisions.[71] Accordingly, we must conclude that, even if the council's actions were improper, they were harmless. See *In re Lukas K.*, supra, 300 Conn. 473–74 (denial of request for continuance in parental termination proceeding was harmless when parent had "not identified on appeal any additional evidence or arguments that he could have presented if the trial court had granted his request"); *State* v. *Lopez*, supra, 280 Conn. 790 (when defendant did not identify on appeal any arguments that defense counsel would have made at sentencing hearing if trial court had granted defendant's request for continuance so that new counsel could review trial transcript, any impropriety in denying request for continuance was deemed harmless).

The judgments are affirmed.

In this opinion the other justices concurred.

[1] We note that § 22a-19 has been amended since BNE filed the petitions at issue in the present case. See Public Acts 2013, No. 13-186, § 1. This amendment is not, however, relevant to the present appeal. For the sake of convenience, we refer to the 2014 supplement of the statute. See footnote 8 of this opinion.

[2] The plaintiffs appealed to the Appellate Court and we transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Thereafter, the two appeals were consolidated for purposes of briefing and oral argument.

[3] We note that § 16-50k (a) has been amended twice since BNE filed the petitions at issue in the present case. See Public Acts 2011, No. 11-80, § 1; Public Acts 2013, No. 13-5, § 33. These amendments are not, however, relevant to the present appeal. For the sake of convenience, we refer to the 2014 supplement of the statute. See footnote 4 of this opinion.

[4] General Statutes (Supp. 2014) § 16-50k (a) provides in relevant part: "Except as provided in subsection (b) of section 16-50z, no person shall exercise any right of eminent domain in contemplation of, commence the preparation of the site for, commence the construction or supplying of a facility, or commence any modification of a facility, that may, as determined by the council, have a substantial adverse environmental effect in the state without having first obtained a certificate of environmental compatibility and public need, hereinafter referred to as a 'certificate', issued with respect to such facility or modification by the council. Certificates shall not be required for (1) fuel cells built within the state with a generating capacity of two hundred fifty kilowatts or less, or (2) fuel cells built out of state with a generating capacity of ten kilowatts or less. Any facility with respect to which a certificate is required shall thereafter be built, maintained and operated in conformity with such certificate and any terms, limitations or conditions contained therein. Notwithstanding the provisions of this chapter or title 16a, the council shall, in the exercise of its jurisdiction over the siting of generating facilities, approve by declaratory ruling (A) the construction of a facility solely for the purpose of generating electricity, other than an electric generating facility that uses nuclear materials or coal as fuel, at a site where an electric generating facility operated prior to July 1, 2004, and (B) . . . any customer-side distributed resources project or facility or grid-side distributed resources project or facility with a capacity of not more than sixty-five megawatts, as long as such project meets air and water quality standards of the Department of Energy and Environmental Protection."

[5] General Statutes § 4-176 (a) provides: "Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency."

[6] General Statutes § 4-177a (a) provides: "The presiding officer shall grant a person status as a party in a contested case if that officer finds that: (1) Such person has submitted a written petition to the agency and mailed

copies to all parties, at least five days before the date of hearing; and (2) the petition states facts that demonstrate that the petitioner's legal rights, duties or privileges shall be specifically affected by the agency's decision in the contested case."

We note that, although the plaintiffs sought party status pursuant to § 4-177a, that statute governs contested cases, which do not include proceedings on petitions for declaratory rulings. See General Statutes (Supp. 2014) § 4-166 (4). Rather, General Statutes § 4-176 (d) authorizes agencies to grant party status to certain persons in proceedings on petitions for declaratory rulings.

[7] General Statutes § 16-50n (a) provides: "The parties to a certification or amendment proceeding or to a declaratory ruling proceeding shall include: (1) The applicant, certificate holder, or petitioner; (2) each person entitled to receive a copy of the application or resolution under section 16-50*l*, if such person has filed with the council a notice of intent to be a party; (3) any domestic or qualified nonprofit corporation or association formed in whole or in part to promote conservation or natural beauty, to protect the environment, personal health or biological values, to preserve historical sites, to promote consumer interests, to represent commercial and industrial groups or to promote the orderly development of the areas in which the facility is to be located, if it has filed with the council a notice of intent to be a party; and (4) such other persons as the council may at any time deem appropriate." The plaintiffs have not specified, and the record does not reveal, under which provision of § 16-50n (a) they sought party status.

[8] General Statutes (Supp. 2014) § 22a-19 (a) (1) provides: "In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

[9] One member of the council dissented from the council's rulings.

[10] The trial court held a joint evidentiary hearing on both appeals, but issued separate memoranda of decision.

[11] The plaintiffs contend that the proposed projects are not "grid-side distribution resources project[s]" for purposes of General Statutes (Supp. 2014) § 16-50k (a) because only proposals for "grid-side distributed resources" that the Public Utilities Regulatory Authority has approved pursuant to General Statutes (Supp. 2014) § 16-243m (g) are eligible for exemption from the requirement for a certificate for "grid-side distributed resources project[s]" set forth in General Statutes (Supp. 2014) § 16-50k (a). See General Statutes (Supp. 2014) § 16-243m (g) (proposals for grid-side distributed resources projects approved by Public Utilities Regulatory Authority are "eligible for expedited siting pursuant to subsection [a] of section 16-50k"). We need not address this claim because we conclude that the proposed projects were facilities for purposes of § 16-50k (a).

[12] The council determined that it had jurisdiction over BNE's petitions pursuant to § 16-50k (a), but did not specifically address the plaintiffs' claim that the projects were not "facilit[ies]" because wind is not a fuel.

[13] The council contends that we should afford deference to its interpretation of § 16-50k (a) because the issue involves "extremely complex and technical regulatory and policy considerations . . . ." *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 692. We conclude that the scope of the council's authority under § 16-50k (a) is not so complex and technical an issue that we are required to rely on the agency's expertise in the area.

[14] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[15] This provision was added to § 16-1 in 1979. See Public Acts 1979, No. 79-214, § 1.

[16] The plaintiffs rely on a number of dictionaries that define "fuel" as combustible matter or matter that is consumed to produce energy.

[17] General Statutes § 16-50g provides in relevant part: "The purposes of

this chapter are: To provide for the balancing of the need for adequate and reliable public utility services at the lowest reasonable cost to consumers with the need to protect the environment and ecology of the state and to minimize damage to scenic, historic, and recreational values; to provide environmental quality standards and criteria for the location, design, construction and operation of facilities for the furnishing of public utility services at least as stringent as the federal environmental quality standards and criteria, and technically sufficient to assure the welfare and protection of the people of the state; to encourage research to develop new and improved methods of generating, storing and transmitting electricity and fuel and of transmitting and receiving television and telecommunications with minimal damage to the environment and other values described above; to promote energy security; to promote the sharing of towers for fair consideration wherever technically, legally, environmentally and economically feasible to avoid the unnecessary proliferation of towers in the state particularly where installation of such towers would adversely impact class I and II watershed lands, and aquifers; to require annual forecasts of the demand for electric power, together with identification and advance planning of the facilities needed to supply that demand and to facilitate local, regional, state-wide and interstate planning to implement the foregoing purposes."

[18] Section 16-50g refers to "community antenna television towers and telecommunication towers [that] have had a significant impact on the environment and ecology of the state of Connecticut . . . ." Although the statute does not expressly refer to electric generating towers, we can perceive no reason why the legislature would have been less concerned about the environmental and ecological impact of such towers.

[19] Indeed, many persons who spoke before the committee referred generally to "power plants" and their effect on the environment, including their negative impact on the state's scenic beauty. See Conn. Joint Standing Committee Hearings, supra, p. 470, remarks of John Lowenthal (referring to "power facilities"); id., p. 471, remarks of Lowenthal (referring to "power plant siting"); id., p. 472, remarks of Lowenthal ("a power company must submit to the council when it applies for permission to build a power plant"); id., p. 476, remarks of Arthur Rickerby, chairman of the Fairfield-Litchfield Environmental Council (public needs "some control over the siting of electric generating plants"); id., remarks of Rickerby (law is required to protect "breathtaking landscapes" of this state); id., p. 477, remarks of William E. Reifsnyder, chairman of the Connecticut Group of the Atlantic Chapter of the Sierra Club (noting "major conflicts arising over the siting of power plants . . . on use of our open spaces—a limited resource" and need to protect "the natural integrity of state parks and forests and other open spaces of exceptional natural beauty"); id., p. 497, remarks of Edward W. Hutchison on behalf of the Connecticut Audubon Council ("In the past the production of electric power has resulted in vast construction, sited simply wherever engineers and businessmen considered most convenient and economically advantageous to themselves. Their heedlessness of environmental factors resulted in many monstrosities and public eyesores, as well as much needless destruction of wildlife and ecological values."); id., p. 507, remarks of Seldon Sixfin ("Many Bethany [c]itizens urge the passage of [the proposed legislation] because they believe state legislation should protect Connecticut's fast-disappearing treasure: its scenic fields and forests. Bethany still has natural beauty which must be protected from the cynical attacks of public utilities in the guise of 'service to the people.' ").

[20] In 2011, the Department of Environmental Protection became the Department of Energy and Environmental Protection. See Public Acts 2011, No. 11-80, § 1, codified as General Statutes § 22a-2d. For purposes of consistency, we refer in this opinion to the Department of Energy and Environmental Protection.

[21] The plaintiffs contend that § 16-50kk is not retroactive. Our point, however, is that, because § 16-50kk does *not* confer jurisdiction over electric generating wind turbine facilities on the council, the council must have had jurisdiction over such facilities *before* § 16-50kk was enacted. Accordingly, the fact that § 16-50kk is not retroactive does not affect our conclusion. The plaintiffs also contend that there is no evidence that § 16-50kk was intended to be clarifying legislation. *Toise* v. *Rowe*, 243 Conn. 623, 628, 707 A.2d 25 (1998) ("[w]here an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect" [internal quotation marks omitted]). Again, however, because the legislature had no reason to believe that the council lacked jurisdiction over wind turbines, there was no call for the legislature to expressly indicate that it was "clarify-

ing" that issue. In any event, there is no question that the legislature has the power to enact clarifying legislation. Accordingly, if this court were to conclude that wind turbines are not "facilit[ies]" for purposes of § 16-50k (a), thereby rendering § 16-50kk meaningless, there is every reason to believe that the legislature would simply enact legislation clarifying that wind turbines are "facilities," thereby overruling our decision.

[22] Accordingly, we need not address the plaintiffs' claim that wind is not a fuel for purposes of § 16-50i (a) (3) or the defendants' claim to the contrary. Even if wind is not a fuel, an electric generating wind turbine is an "electric generating . . . facility . . . ." General Statutes § 16-50i (a) (3).

[23] The trial court concluded that, with respect to the Colebrook South project, the plaintiffs were not classically aggrieved by the council's ruling approving the project because the project would not have a significant impact on their properties. Accordingly, the court concluded that "[t]he plaintiffs lack standing to raise, for example, the argument . . . that the phrase 'as long as such project meets air and water quality standards' [set forth in General Statutes (Supp. 2014) § 16-50k (a)] does not restrict the council's review to air and water quality only, but requires the council to review the project under [General Statutes (Supp. 2014)] § 16-50p." The court also concluded, however, that the plaintiffs had statutory standing pursuant to § 22a-19 to claim that the project would unreasonably impair the public trust in the natural resources of the state by polluting the water, causing excessive noise and harming wildlife.

[24] "These conditions required Stew Leonard's to submit: (1) '[r]evised and updated erosion control plan that implements all [s]tate [r]egulations'; (2) '[a]dditional detailed information . . . required for the silt fence and hay bales'; (3) '[a] plan that addresses the placement of eco stone pavers and the winter sanding issues'; (4) '[a]ny and all conflicts with soil, pipes, inverts and any other problems as discussed are addressed as part of the [s]torm [d]rainage [p]lan'; and (5) 'a phasing plan [designed by its engineer] to minimize large disturbed areas and design the project to be constructed as practical[ly] as possible without leaving large areas open for erosion.' " *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 16 n.5.

[25] The plaintiffs' expert, William F. Carboni, submitted "pre-filed" testimony to the council stating that, in his opinion, the stormwater management and erosion control plans that BNE submitted with its petitions did not comply with water quality standards. BNE's expert, Melvin L. Cline, submitted testimony to the council, however, in which he opined that the plans for the Colebrook South project met or exceeded governing standards. BNE's expert, Curtis Jones, submitted similar testimony regarding the plans for the Colebrook North project. The credibility of these witnesses was for the council to determine. *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, supra, 286 Conn. 86. In addition, although we have concluded that the scope of the council's authority under § 16-50k is not so complex and technical an issue that we must defer to the agency's expertise; see footnote 13 of this opinion; whether a particular project complies with the substantive requirements for approval is a highly technical and complex determination, and we therefore must defer to the council's expertise on that issue, and "limit our review to a determination of whether the [council] gave reasoned consideration to all of the relevant factors or whether it abused its discretion." *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 692; see also id. (agency's ruling is entitled to deference when issue involves "extremely complex and technical regulatory and policy considerations"); *Christopher R.* v. *Commissioner of Mental Retardation*, 277 Conn. 594, 611, 893 A.2d 431 (2006) ("we generally defer to an agency with expertise in matters requiring such a technical, case-by-case determination"); *Sweetman* v. *State Elections Enforcement Commission*, supra, 249 Conn. 332 (it is not role of trial court or of this court to substitute its judgment for agency's expertise).

[26] See *Middlebury* v. *Connecticut Siting Council*, Superior Court, judicial district of New Britain, Docket No. CV-01-0508047-S (February 27, 2002) (plaintiffs filed petition for declaratory ruling seeking determination as to whether development and management plan violated terms of siting council's final decision).

[27] See *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 23 ("[T]he plaintiff would be afforded the opportunity to review [any additional submissions required by the conditions] and to inform the commission of any inadequacies that [may be discovered] or any additional concerns raised by the information received. If the commission should fail to take appropriate action, [the interested party] . . . would not be without recourse. For over

one hundred years in this state, we have recognized the general power of equity to afford relief by injunction and damages for injury caused by a nuisance created by the unreasonable conduct on one's own property of an otherwise lawful activity." [Internal quotation marks omitted.]).

[28] We express no opinion as to whether the plaintiffs in the present case would have standing to raise any of these claims or, if so, whether they ultimately could prevail.

[29] As we have indicated, the trial court concluded that, in the appeal from the council's ruling on the Colebrook South petition, the plaintiffs were not classically aggrieved by the council's ruling because the proposed project would have no significant effect on their properties. See footnote 23 of this opinion. The court also concluded, however, that the plaintiffs had standing under § 22a-19 to raise the claim that the project would cause excessive noise. Id. On appeal to this court, the plaintiffs do not challenge the trial court's determination that they were not classically aggrieved and the defendants do not challenge the court's finding that the plaintiffs had standing pursuant to § 22a-19.

[30] In their posthearing briefs to the council, the plaintiffs clarified that BNE had measured noise levels at the nearest residential bedroom.

[31] The materials submitted by BNE with their petitions stated that "[t]he human ear does not perceive sound levels from each frequency as equally loud. To compensate for this phenomenon in perception, a frequency filter known as A-weighted ('dBA') is used to evaluate environmental noise levels."

[32] General Statutes § 16-50x (a) provides in relevant part: "Notwithstanding any other provision of the general statutes, except as provided in section 16-243, the council shall have exclusive jurisdiction over the location and type of facilities and over the location and type of modifications of facilities subject to the provisions of subsection (d) of this section. . . . In ruling on applications for certificates or petitions for a declaratory ruling for facilities and on requests for shared use of facilities, the council shall give such consideration to other state laws and municipal regulations as it shall deem appropriate. . . ."

[33] The council contends that it "did not err is issuing a decision *in conflict* with the [department's] specifications for using the property line for measuring noise levels . . . ." (Emphasis added.) The council also states that it made extensive findings with respect to the Colebrook South project that the noise levels would comply with the department's noise level regulations "*at the nearest residence*"; (emphasis added); and, with respect to Colebrook North, "likewise held that BNE's project would comply with [the department's] noise regulations." It is clear, therefore, that the council does not contend that the projects complied with the portion of department's noise regulations that requires noise levels to be measured at the projects' property lines.

[34] The council acknowledges that it, in fact, considered noise issues when ruling on BNE's petitions, but contends that it "cannot expand its own jurisdiction by considering more than its mandate." We note that the council also considered setbacks, ice throw, shadow flicker, effects on wildlife, visibility and historic and cultural issues.

[35] The trial court concluded that, although the plaintiffs were classically aggrieved by the council's decision on the petition for the Colebrook North project, they were entitled by virtue of their status as parties to the proceedings on the petition to raise issues concerning only air and water quality pursuant to § 16-50k (a). The court also concluded, however, that, by virtue of their status as intervenors pursuant to § 22a-19, the plaintiffs could raise other environmental issues, including excessive noise, in both appeals. We conclude that, pursuant to § 16-50x, the council has jurisdiction to consider state laws outside of the act, including state noise law, regardless of whether the party raising the issue has intervened in the proceeding pursuant to § 22a-19.

[36] We note that § 16-50j has been the subject of several recent amendments by our legislature. See, e.g., Public Acts 2011, No. 11-101, § 2. These amendments are not, however, relevant to the present appeal. For the sake of convenience, we refer to the 2014 supplement of the statute.

[37] We note that § 16-50p has also been the subject of several recent amendments by our legislature. See, e.g., Public Acts 2014, No. 14-94, § 36. These amendments are not, however, relevant to the present appeal. For the sake of convenience, we refer to the 2014 supplement of the statute.

[38] The plaintiffs concede that § 16-50kk is not retroactive.

[39] For example, the Department of Banking has jurisdiction over banks, but there is no reason to believe that it would have the expertise to ensure

that banks are complying with noise regulations.

[40] The plaintiffs state conclusorily that "[n]othing about [§ 16-50x (a)] indicates that the council has the right to operate above or in contradiction to state laws," including state noise laws. They do not reconcile this position with the plain language of § 16-50x (a) providing in relevant part that "[i]n ruling on . . . petitions for a declaratory ruling for facilities . . . the council shall give such consideration to other state laws . . . as it shall deem appropriate." It is simply impossible to interpret this provision as *requiring* the council to consider state laws outside of the act when ruling on petitions for declaratory rulings, and the plaintiffs have pointed to nothing in the act that requires the council to deny petitions that do not comply with state noise law. To the extent that the plaintiffs claim that excessive noise violates CEPA, although this provision of § 16-50x (a) authorizes the council to consider the provisions of CEPA, it does not *require* the council to consider those provisions or to deny petitions that are in conflict with them. Finally, with respect to BNE's claim that, although the council is not required to consider state noise law, the department has jurisdiction to require facilities subject to the act to comply with that law, that question is not before us in these appeals.

[41] This interpretation is consistent with the legislative history of § 16-50x. The purpose of the statute, which was enacted in 1973; see Public Acts 1973, No. 73-458, § 4; was to "establish what is called one-stop permitting, that is, the need for a utility to get only one permit before it could build and operate a power facility." (Internal quotation marks omitted.) Conn. Joint Standing Committee Hearings, Environment, Pt. 2, 1973 Sess., p. 720, written comments of Dan Lufkin, Commissioner of Environmental Protection. Lufkin stated that "[t]he argument made in support of one-stop permitting is that centralized regulation of power facilities siting is in the public interest because it promotes efficiency. Utilities, the argument goes, are needlessly burdened with various permit requirements." Id. John Lowenthal, a professor of law at Rutgers University School of Law and one of the original drafters of the act, submitted a written statement in which he argued that "[u]tility interests fight hard to get 'one-stop' service, because they know they can more likely control one agency than contend successfully with an array of regulatory agencies, local interests, and environmental groups." Id., p. 733. Both Lufkin and Lowenthal argued unsuccessfully against the enactment of the legislation that was codified as § 16-50x. Id., pp. 720–22, 733–34. Colin C. Tait, who is now the vice chairman of the council, submitted a written statement to the Joint Standing Committee in which he argued that "the concept of one-stop licensing is meritorious provided the one-stop is a meaningful, full-fledged inquiry into the matter and that the public has had an ample opportunity to be heard. I believe [that the proposed legislation] satisfies those criteria and that one-stop licensing could help reduce the time and cost involved in meeting the reasonable power needs of Connecticut citizens without jeopardizing our environment." Id., p. 736. During the debate on the proposed legislation in the House of Representatives, Representative Richard H. Wagner explained that the legislation "would provide for what has been referred to . . . as [a] one-stop application procedure. Currently amongst the various and sundry state, federal, and local agencies that a power plant or public utility must go before to have a power plant, [there are] approximately sixteen separate applications. The one-stop does not mean that all of these would be eliminated but it would consolidate the ones on the state level to one. Currently a utility must go before the power facilities evaluation council if there is any environmental impact as far as tidal wetlands or other things that must go before the [D]epartment of [Energy and] [E]nvironmental [P]rotection and also must go before the [P]ublic [U]tilities [C]ommission. [At] each one of these there is the power of individuals to bring an action after the administrative decision has been made by the agency. This gives the possibility of tying an applicant up into three separate court suits." 16 H.R. Proc., Pt. 12B, 1973 Sess., p. 6237. It is clear, therefore, that § 16-50x was intended to increase the efficiency of proceedings on applications for certificates and to reduce the burdens on utility companies in those proceedings.

[42] The council found that "Rock Hall . . . is a property listed on the National Register of Historic Places. It was designed and built in 1911 and 1912 as a private residence by Addison Mizner." The property line for Rock Hall is 2198 feet from the nearest wind turbine. The plaintiffs Stella Somers and Michael Somers submitted written testimony to the council stating that they own Rock Hall and operate it as a "luxury inn and bed and breakfast . . . ."

[43] In their trial brief to the trial court, the plaintiffs claimed that BNE had presented no evidence to the council regarding the effect of the eighty meter hubs on water or air quality. They further argued that lowering the hub heights would result in increased noise at the property lines and that there was no evidence that eighty meter hubs were feasible on the site.

[44] The plaintiffs contend that the council should not have considered Corey's statement because he made it "[a]fter the close of evidence . . . ." (Emphasis in original.) The hearings before the council were conducted in a somewhat informal manner, however, and it does not appear that there was any formal "close of evidence . . . ." Rather, at the end of a session in which the council members and various parties were presenting questions to a panel of BNE witnesses, and while all parties were still present, Corey asked Tait if he could respond to an issue that Golembewski had raised earlier in the session, and Tait allowed him to do so without objection by any party. Although the plaintiffs asked that Corey's statement be stricken, they did not explain the basis for that request. On appeal to this court, they have represented that the basis for their request was that the statement was unsupported by the evidence, not that it was offered after the close of evidence.

[45] We conclude that the trial court misinterpreted Bahtiarian's testimony when it found that lowering the hub heights would have no effect on noise levels. As we have indicated, although Bahtiarian testified that lowering the hub heights would not affect the level of noise produced by the wind turbines, he also testified that it would decrease the distance between the hubs and the property line, thereby increasing noise levels at certain locations on the property line.

Bahtiarian's estimate of a three decibel increase noise levels at the property line was based, however, on the combined effects of lowering the hub heights and the noise tolerance factor that had been discovered after the council issued its rulings. Bahtiarian testified that the noise tolerance factor was two decibels, meaning that the noise produced by the wind turbines could be two decibels louder than the level stated in the documents that BNE submitted with its petition. Therefore, in and of itself, the effect of lowering the hub heights on noise levels at certain locations on the property line would be less than three decibels. The plaintiffs have pointed to no evidence concerning the effect that lowering hub heights would have on noise levels at nearby residences, which were the noise levels that the council considered.

[46] Nothing prevents the plaintiffs from filing a petition for a declaratory ruling with the council seeking this remedy.

[47] The plaintiffs contend that the State Historic Preservation Office concluded that "shorter hub heights would have an *adverse effect* on the characteristics of Rock Hall that made it eligible for inclusion on the National Register of Historic Places." (Emphasis in original.) The letter that the office submitted to the council states, however, that, "[i]n the opinion of this office, the proposed . . . Colebrook North project (*whether at 100 meter hub height or 80 meter hub height*) has a clear and substantial presence at close proximity to the Rock Hall property." (Emphasis added.) Thus, the State Historic Preservation Office did not state that lowering the hub heights *itself* would have an adverse effect on the Rock Hall property.

[48] As we have indicated, the trial court held that the plaintiffs were not classically aggrieved by the council's ruling on the Colebrook South project because that project would have no effect on their properties; see footnote 23 of this opinion; and the plaintiffs have not challenged that holding on appeal to this court.

[49] General Statutes (Supp. 2014) § 16-50j (h) provides in relevant part: "Prior to commencing any hearing pursuant to section 16-50m, the council shall consult with and solicit written comments from (1) the Department of Energy and Environmental Protection . . . . Copies of such comments shall be made available to all parties prior to the commencement of the hearing. Subsequent to the commencement of the hearing, said [department] . . . may file additional written comments with the council within such period of time as the council designates. All such written comments shall be made part of the record provided by section 16-50o. . . ."

[50] Neither party indicates where in the record the council's order barring the plaintiffs from cross-examining Riese can be found. The council does not dispute, however, that it did not allow Riese to testify.

[51] Specifically, the council relied on Riese's comments to support their findings that several species of bats could be found on project sites, that the project would likely have some negative impact on those species, and

that postconstruction monitoring of the situation was recommended.

[52] After the close of evidence, the plaintiffs also submitted a motion requesting that the trial court supplement the record with an affidavit by their attorney concerning a conversation that she had had with Riese regarding the projects. The plaintiffs' attorney stated in the affidavit that she had submitted a freedom of information request to the Commissioner of Energy and Environmental Protection requesting certain materials that BNE had submitted to the department in connection with the proposed projects. The attorney had recently spoken to Riese regarding the request and Riese had stated incorrectly that there were only " 'a few hundred square feet of wetlands' " on the project sites and that the only area of concern was a " 'very small stream' " that a person could " 'easily step over.' " The council opposed the motion on the ground that the plaintiffs had not alleged that supplementing the record was required to correct an irregularity in the proceedings before the council and that Riese had disputed the accuracy of the plaintiffs' attorney's characterization of their conversation in another affidavit. The trial court denied the plaintiffs' motion.

[53] General Statutes § 16-50o (a) provides in relevant part: "Every party or group of parties as provided in section 16-50n shall have the right to present such oral or documentary evidence and to conduct such cross-examination as may be required for a full and true disclosure of the facts."

[54] As we have indicated, the plaintiffs had party status in both proceedings before the council pursuant to § 16-50n (a). The trial court concluded that the plaintiffs did not have standing as parties to appeal from the council's ruling on the Colebrook South petition, however, because they were not aggrieved. See footnote 23 of this opinion. Thus, in the appeal from that petition, they had only the rights of intervenors pursuant to § 22a-19. The plaintiffs had standing as parties pursuant to § 16-50n (a), however, in the appeal from the ruling on the Colebrook North petition. It is unclear why the trial court stated otherwise. On appeal to this court, the defendants have not claimed that intervenors in proceedings on petitions for declaratory rulings have less expansive rights than parties.

[55] The council contends that "[n]owhere in the statutory scheme is there authority for oral testimony or even sworn testimony [by representatives of the agencies from whom the council is required to solicit comments pursuant to § 16-50j (h)]. Rather, the statute repeatedly and expressly requires *written comments*, similar to an amicus brief or public comments." (Emphasis in original.) We see nothing in the statutory scheme that would *prohibit* the council from calling such persons as witnesses, however, if doing so were required for a "full and true disclosure of the facts . . . ." General Statutes § 4-178 (5); see also General Statutes § 16-50o (a).

[56] The plaintiffs contend that the violation of their right to "fundamental fairness was not resolved by [their] ability to offer their own written and testimonial evidence to rebut the Riese letters, because [their] due process right consisted of the right to cross-examin[ation]. See [*Wadell* v. *Board of Zoning Appeals*, 136 Conn. 1, 8, 68 A.2d 152 (1949)] ('[c]ross-examination is the greatest aid to the ascertainment of the truth which the advocate possesses') . . . ." (Citations omitted.) The plaintiffs did not have an unqualified right, however, to cross-examine witnesses in the hearings on BNE's petitions and, having failed to explain to the council the basis of their request to call Riese as a witness, they cannot now claim that council should have known that cross-examination of Riese was required for a "full and true disclosure of the facts." General Statutes § 4-178 (5); accord General Statutes § 16-50o (a). Moreover, even if cross-examination would have been the *best* method to ascertain the reliability of Riese's comments, the plaintiffs might have been able to rebut the comments by other methods. The plaintiffs represent in their brief to this court that the deficiencies in Riese's letters included "silence regarding water quality issues and BNE's failure to conduct raptor, vernal pool, fauna and bird migration surveys, accompanied by a focus on the potential visibility of the projects, which is not within [the department's] purview." The plaintiffs easily could have brought these issues to the council's attention without cross-examining Riese.

We also disagree with the plaintiffs' contention that they were deprived of an opportunity to establish prejudice because the trial court denied their motion to supplement the record with their attorney's affidavit. See footnote 52 of this opinion. The council was entitled to rely on the record before it when deciding whether the plaintiffs would be prejudiced if it did not allow Riese to testify, and the affidavit concerned events that occurred long after the council issued its rulings.

[57] General Statutes (Supp. 2014) § 16-50p (a) (3) provides that, in proceedings on applications for certificates, "[t]he council shall not grant a certificate . . . unless it shall find and determine . . . (B) [t]he nature of the probable

environmental impact of the facility alone and cumulatively with other existing facilities . . . ."

[58] Section 16-50p (a) (3) (B) applies only to applications for certificates, not to petitions for declaratory rulings. The defendants do not claim on appeal, however, that the council lacks authority to consider the cumulative impact of facilities approved by declaratory ruling.

[59] The council found in its ruling on the Colebrook South project that, "[i]n modeling noise at all of the receptor locations in both Colebrook North and South, BNE assumed noise from all six of the turbines." In its ruling on the Colebrook North petition, the council found that "[t]he noise levels predicted were based on the cumulative noise impact of the six proposed turbines . . . ."

[60] In other words, the plaintiffs did not specify whether the cumulative effect of the projects would impair air and water quality, scenic values, noise levels, or some other environmental value that the council considered.

After the parties submitted their trial briefs to the trial court, the trial court asked the council to submit record citations regarding the cumulative impact of the projects. The plaintiffs submitted a response to the council's submission in which they argued that the citations provided by the council did not support its conclusion that there would be no cumulative impact. They did not point to any evidence, however, that would support a finding that the projects would have a negative cumulative impact.

[61] We disagree with the trial court's determination that the plaintiff lacked standing to raise noise issues in their capacity as parties. We concluded in part III of this opinion that the council has jurisdiction to consider issues other than air and water quality, such as state noise laws, when ruling on petitions for declaratory rulings under the act even in the absence of any CEPA claim because the council is authorized to "give such consideration to other state laws and municipal regulations as it shall deem appropriate" pursuant to § 16-50x. See footnote 35 of this opinion.

[62] In its memorandum of decision in the appeal from the council's ruling on the Colebrook South petition, the trial court stated that "[t]he plaintiffs' own experts denied that the cumulative impact of the projects affected the environment in [this] project. The plaintiffs' point on cumulative impacts, in any event, is visual, rather than environmental. The plaintiffs have argued that [the two] projects affect those in the area of the [Colebrook] North project and this is discussed in" the court's memorandum of decision in that case.

[63] General Statutes (Supp. 2014) § 1-210 (a) provides in relevant part: "Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to (1) inspect such records promptly during regular office or business hours, (2) copy such records in accordance with subsection (g) of section 1-212, or (3) receive a copy of such records in accordance with section 1-212. . . ." We note that § 1-210 has been the subject of several recent amendments by our legislature. See, e.g., Public Acts 2014, No. 14-217, § 18. These amendments are not, however, relevant to the present appeal. For the sake of convenience, we refer to the 2014 supplement of the statute.

[64] General Statutes (Supp. 2014) § 1-210 (b) (5) (A) provides in relevant part: "Nothing in the Freedom of Information Act shall be construed to require disclosure of:

* * *

"(5) (A) Trade secrets, which for purposes of the Freedom of Information Act, are defined as information, including formulas, patterns, compilations, programs, devices, methods, techniques, processes, drawings, cost data, customer lists, film or television scripts or detailed production budgets that (i) derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and (ii) are the subject of efforts that are reasonable under the circumstances to maintain secrecy . . . ."

[65] "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound . . . or a list of customers. . . . Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. A trade secret is known only in the particular business in which it is used. It is not essential

that knowledge of it be restricted solely to the proprietor of the business. He may, without losing his protection, communicate the secret to employees or to others who are pledged to secrecy. Nevertheless, a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means. Some of the factors to be considered in determining whether given information is a trade secret are (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." (Citations omitted; internal quotation marks omitted.) *Town & Country House & Homes Service, Inc.* v. *Evans*, supra, 150 Conn. 318–19.

[66] The plaintiffs have not challenged this characterization of the protective orders on appeal. In their opposition to BNE's motions to file records under seal, however, the plaintiffs contended that "the restrictions of the [protective orders] rendered the information filed under seal useless to the parties. For example, the [r]aw [w]ind [d]ata was available on CD in a static PDF format and was more than 1176 pages long. . . . [The plaintiffs] therefore could not provide the information to their experts, and it would certainly not have been fruitful to have an expert travel to [the council's offices] to . . . review thousands of pages of static data in a PDF chart without taking notes." (Citation omitted.)

[67] On appeal to the trial court, BNE filed a motion to file the protected materials under seal, which the trial court granted. Thereafter, the parties entered into a joint stipulated protective order providing that the material would be made "available to the plaintiffs, their lawyers and member of their lawyers' staff as needed," provided that those persons executed a nondisclosure agreement and agreed to be bound by the protective order. The stipulated protective order also provided that no photocopying, tape recording or photographing of the materials would be permitted, but that persons with access to the materials could take notes. The order further provided that parties and their lawyers could "share their notes taken during review of the [p]rotected [m]aterials with their expert witnesses and staff who may be assisting those experts . . . ." The plaintiffs do not challenge the court's sealing order or the terms of the stipulated protective order on appeal to this court.

[68] The protective orders provided that "no note-taking of any kind whatsoever *of the protected materials* will be permitted." (Emphasis added.) Although the parties were not allowed to *copy* any part of the sealed materials, the record is not clear as to whether the council intended that the parties would be prohibited from taking *any notes* while in the presence of the sealed materials, even if the notes would not reveal protected information.

[69] As we have indicated, Bahtiarian also testified that the tolerance factor of two decibels, when combined with lowering the hub heights to eighty meters, would result in a worst case three decibel increase at the property lines for the Colebrook North project. The plaintiffs have not specified whether or where Bahtiarian testified as to the effect of the tolerance factor alone on noise levels at the property lines on either of the two projects.

[70] The plaintiffs also claim that the projects did not comply with the manufacturer's recommended setback requirements, which were publicly available. They contend that they were prevented from cross-examining witnesses about this issue during the hearings on the Colebrook North petition when counsel for BNE objected to the line of questioning because it involved confidential information. The council's staff attorney advised counsel for the plaintiffs, however, that, if he wanted to question BNE about compliance with the recommended setback requirements, he could submit questions to BNE that would be answered under seal. Counsel for the plaintiffs indicated that he would do so. Accordingly, the plaintiffs were not prevented from obtaining information or questioning BNE witnesses about this issue.

[71] The plaintiffs state in a footnote in their brief to this court that BNE did not submit spring migratory bird studies and acoustic bat monitoring surveys until after the council rendered its decisions. The plaintiffs do not identify any information in those materials, however, that likely would have affected the council's decisions. The plaintiffs also contend that they had very little time to prepare for their cross-examination of Michael Klemens,

the author of a wildlife assessment that BNE submitted after the hearings had begun, and that "[t]hese instances of late filing were particularly detrimental to [the] plaintiffs because Klemens made several discoveries that contradicted assertions made by BNE in its petitions, including the presence of valuable habitats on both sites likely to support several state listed species." The plaintiffs, however, have not identified what additional questions they would have asked Klemens or what additional evidence they would have presented to the council in the event they were afforded more time. Moreover, the plaintiffs have not explained how any such additional information would have affected the council's decisions.

——————————————————